GRAND LABORATORIES, INC.,
Plaintiff,

v.

Patricia HARRIS, Secretary of Health,
Education and Welfare, Defendant.

No. Civ 79–4126.

United States District Court,
D. South Dakota, S. D.

Feb. 21, 1980.

Qualley, Larson & Jones, Sioux Falls, S. D., for plaintiff.

John J. Ulrich, Asst. U. S. Atty., Sioux Falls, S. D., and Frederick H. Degnan, Asst. Chief Counsel, Food and Drug Administration, Dept. of Health, Education and Welfare, Rockville, Md., for defendant.

## MEMORANDUM DECISION

NICHOL, Chief Judge.

This case, involving the interplay between the Virus, Serum, and Toxin Act of 1913 (VSTA), 21 U.S.C. section 153 et seq., and the Food, Drug, and Cosmetic Act (FDCA), 21 U.S.C. section 301 et seq., is one of first impression. Plaintiff is a South Dakota corporation engaged in the production and marketing of animal biologics. Defendant is joined in her capacity as supervisor of the Food and Drug Administration (FDA). Defendant obtained a search warrant from the United States Magistrate directed against the plaintiff's facility. Plaintiff brought this action seeking declaratory and injunctive relief against the FDA on the grounds that the FDA has not been empowered by Congress to regulate the manufacture and sale of animal biologics. A temporary restraining order was issued and a hearing on a motion for preliminary injunction set. The FDA elected to move for dismissal rather than file an answer.

The parties basically agree on the facts relevant to the issue of jurisdiction. The plaintiff apparently manufactures and sells animal biologics wholly within the state of South Dakota. Animal biologics are products prepared from animal tissues or fluids or growth of microorganisms used for the prevention or treatment of disease in animals. The particular product around which this dispute has centered is known as "Por-

cine Mastitis-Metritis-Arthritis-Infertility Bacterin" (Bacterin). The antigen (the biological component intended to produce an immune response) in the Bacterin is an organism known as Streptococcus equisimilus. The Bacterin also contains an adjuvant, a substance that is intended to enhance the immune response to the antigen. The particular adjuvant used in the Bacterin is aluminum hydroxide. The FDA introduced evidence tending to show that aluminum hydroxide is not produced in South Dakota and, further, that plaintiff had purchased aluminum hydroxide from a chemical firm in New Jersey.

The gravamen of the plaintiff's contention is that the VSTA granted sole federal regulatory power over the manufacture and sale of animal biologicals to the United States Department of Agriculture (USDA). The grant of jurisdiction to the USDA only reaches animal biologicals delivered or offered for delivery in interstate commerce; regulation of animal biologics produced and marketed on an intrastate basis, even where a component has passed through interstate commerce, being left to the various states.[1] In support of its contention that the federal regulation of animal biologics rests solely with the USDA the plaintiff points to the following language in the FDCA:

> Nothing contained in this Act shall be construed as in any way affecting, modifying, repealing, or superseding . . . the virus, serum, toxin, and analogous products provisions, applicable to domestic animals, of the Act of Congress approved March 4, 1913 . . . . .

21 U.S.C. section 392(b) (1970). The obvious implication of the plaintiff's position is that no federal agency has congressional authority to regulate plaintiff's activities.

The FDA contends that the Bacterin is a drug within the meaning of the FDCA and that jurisdiction exists because a component, the adjuvant aluminum hydroxide, has passed through interstate commerce.

---

1. The USDA has apparently recognized that the VSTA does not grant jurisdiction over "intrastate" animal biologics that merely have a component that has passed through interstate commerce. An attorney for the USDA so represented in proceedings in another District. *Animal Health Institute v. USDA*, 487 F.Supp. 376 (D.Colo.1979).

The FDA views the language of 21 U.S.C. 392(b) as precluding it from asserting jurisdiction only over animal biologicals subject to regulation by the USDA. As the VSTA does not grant the USDA jurisdiction over animal biologicals produced and distributed within the boundaries of a single state, the FDA contends that it has jurisdiction over such "intrastate" biologicals when one of the components has passed through interstate commerce.

Both parties have pointed to legislative history, prior enactments, and the past practices of various agencies in support of their interpretation of 21 U.S.C. section 392(b). Our inquiry must, of course, start with the language of the provision. "Though we may not end with the words in construing a disputed statute, one certainly begins there." F. Frankfurter, Some Reflections on the Reading of Statutes, 16 (1943); quoted with approval in *Andrus v. Allard*, 444 U.S. 51, 56, 100 S.Ct. 318, 322, 62 L.Ed.2d 210 (1979). By the combination of words used in section 392(b), Congress seems to have said that what the VSTA hath wrought let not the FDCA lay assunder. The histories of the various acts dealing with the purity and effectiveness of food and drugs, and biologicals for animals and humans indicate that the VSTA was intended as the sole federal effort in the regulation of animal biologics.

Adulterated or unwholesome drugs, along with food and liquor, were first subjected to federal regulation in 1890. See, Ch. 839 section 2, 26 Stat. 415. This first effort only applied to articles imported into the United States or its territories. In 1902 an Act was passed regulating the interstate commerce of human biologics. Act of July 1, 1902, ch. 1378, 32 Stat. 728. The 1902 Act was administered by the Public Health Service, at that time a division of the Treasury Department.

The Food and Drug Act of 1906 provided for the regulation of food, drugs and liquor placed in interstate commerce. Act of June 30, 1096, ch. 3915, 34 Stat. 768. The Act applied to articles received or delivered in "original unbroken packages" having passed through interstate commerce. *Id.*, section 2, 34 stat. at 768. The term "drug" was defined as including "all medicines and preparations recognized in the United States Pharmacopeia or National Formulary for internal or external use, and any substance or mixture of substances intended to be used for the cure, mitigation, or prevention of disease of either man or other animals." *Id.*, section 6, 34 Stat. at 769. Although this definition has received some subsequent embellishment, it remains substantially the same. Primary responsibility for enforcement of the Act was assigned to the Bureau of Chemistry in the Department of Agriculture. See, Appropriations Act for Dept. of Agriculture, March 4, 1917, ch. 179, 39 Stat. 1151.

In the first part of the next decade farmers were suffering considerable losses as a result of the somewhat motley manufacture and distribution of anti-hog cholera serum. The Department of Agriculture apparently felt that the authorization to regulate animal drugs contained in the Food and Drug Act of 1906 did not provide adequate authority to regulate anti-hog cholera serum; the Department procured the passage of the VSTA in response to the anti-hog cholera serum problem. *See, Hall v. State*, 100 Neb. 84, 158 N.W. 362 (1916). The VSTA, then as now, provided for the regulation of animal biologicals shipped in interstate commerce, with no jurisdiction over biologics merely having a component that had passed through interstate commerce. Responsibility for its administration was placed with the Bureau of Animal Industry, a subdivision of the Department of Agriculture. Appropriations Act of March 4, 1917, Ch. 179, 39 Stat. 1138.

The Food and Drug Act was extensively revised in 1938. Among other changes the jurisdiction over drugs extended to articles intended for use as components in drugs. Act of June 25, 1938, ch. 675, section 201, 52 Stat. 1041, (current version at 21 U.S.C. section 321(g) (1970)). It was explicitly stated in the Senate debate on the 1938 Act

that no *new* authority was provided for FDA supervision [2] of *human* biologics.

*Mr. Vandenberg.* Will the Senator also make a statement for the record as to the effect of this proposed legislation upon biological products, and the possible interference with the existing serum act of 1902, and the existing administration of biological supervision?

*Mr. Copeland.* If the Senator will turn to the last page of the bill, page 56, and read line 6, 7, and 8, he will see that it is provided that the provision of this bill shall not be held to modify or repeal any of the existing laws of the United States, except as provided by paragraph (A) of Section 717. That particular law mentioned by the Senator is not dealt with at all by this bill, and there is no thought of transfering that very well done function of the Public Health Service to the Food and Drug Administration.

*Mr. Vandenberg.* And no new authority over biological products is contained within the bill?

*Mr. Copeland.* Not the slightest.

79 Cong.Rec. 5018 (1935). It is befitting to note that this colloquy occurred at a time when the PHS was in the Department of Treasury and the FDA in USDA. The situation had changed by 1944 when the provisions regulating human biologics were amended.

In 1939 the PHS was transferred from Treasury to the newly created Federal Security Agency. Reorg. Plan No. 1 of 1939, reprinted in 53 Stat. 1423 et seq. The following year the FDA and its functions were transferred to the Federal Security Agency. Reorg. Plan No. 4 of 1940, reprinted in 54 Stat. 1234 et seq. When the Virus, Serum, and Toxin Act of 1944, dealing with human biologics, was passed Congress made it clear that the FDCA also applied to human biologics. "Subsection (g) is an explicit state-

ment, confirming the present legal situation, that products subject to this section are not exempted from the Federal Food, Drug, and Cosmetic Act, except for the provision of that act relating to the licensing of new drugs." H.R.Rep.No.1364 78th Cong., reprinted in (1944) U.S.Code & Cong. Serv. p. 1234; subsection (g) of that Act is now codified at 42 U.S.C. section 262(g). It was felt that the Federal Security Administrator should have the power to recommend seizure under the FDCA when a dangerous product reached the market in spite of the controls exercised by the PHS. S.R.No. 1027, 78th Cong., 2d Sess. (1944). Prior to this nothing appears in Acts of Congress or case history to indicate that the FDCA applied to human biologics. And, indeed, the above quoted discussion between Senators Copeland and Vandenberg in 1935 indicates that the FDCA was not perceived to cover human biologics until sometime after the FDA and PHS were placed in the same agency.

The posture of the USDA were markedly different in 1968 when Congress passed the Animal Drug Amendments to the FDCA from that of the Federal Security Administrator in 1944.[3] The 1968 Amendments were intended to streamline the procedures for the clearance of new animal drugs under the FDCA. See, S.Rep.No.1308, 90th Cong. (1968) U.S.Code & Admin.News, p. 2607. The acting Secretary of Agriculture expressed concern over the possible effect of the 1968 FDCA amendments on the VSTA.

Virus, Serums, toxins, and analogous products coming within the purview of the Virus-Serum-Toxin Act are all biological products. Historically, the Secretary of Agriculture has regulated such animal biologics, many of which are not used for animals that are a source of human food. Under the provisions of H.R. 3639, these

---

2. Food and Drug regulation had been shifted from the Bureau of Chemistry to a separate Food and Drug Administration within the Department of Agriculture in 1927. *Cf.* Appropriation Act of May 11, 1926, 44 Stat. 515, with Appropriation Act of January 18, 1927, ch. 39, 44 Stat. 991, 44 Stat. 1002.

3. All agencies of the Federal Security Agency were transferred to the Department of Health, Education, and Welfare in 1953. Reorg. Plan No. 1 of 1953, reprinted in Appendix to Title 5 of U.S.C.

animal biological products, if considered to be new animal drugs, could not be shipped in interstate or foreign commerce until applications therefor were approved by the Secretary of Health, Education, and Welfare. Also processing of these applications would be a duplication of work already being performed by the Department of Agriculture and would serve no useful purpose.

H.R.Rep.No.875, 90th Cong. 10 (1968). Section 392(b) was amended to make it "clear that the act does not supersede the virus, serum, toxin, and analogous provisions of the act of March 4, 1913." H.R.Rep.No.875, 90th Cong. (1968). The intended effect of section 392(b) is maintenance of the status quo. In the context of regulation of animal biologics the status quo has been regulation by the Secretary of Agriculture under the VSTA.

The FDA has correctly pointed out that great weight should be given to an agency's construction of a statute. The definition of "drug", however, appears to have already been construed as not encompassing animal biologics. As mentioned above, the USDA procured the passage of the VSTA in 1913. At that time the Food and Drug Act of 1906 was administered by the USDA and the definition of "drug" contained in that act was apparently not viewed as encompassing animal biologics. The basic definition of "drug" was not materially changed in the meantime. And the circumstances surrounding the inclusion of the VSTA in section 392(b) indicate that Congress concurred with the USDA interpretation.

Two other factors provide impetus for finding that animal biologics are not subject to regulation by the FDA. First, the FDA concedes that if the Bacterin were produced or shipped in interstate commerce as defined by the VSTA there is no jurisdiction under the FDCA. There is little logical appeal to an interpretation of section 392(b) that would place jurisdiction over the manufacture and distribution of animal biologics when the marketable product crossed state lines in one federal agency and jurisdiction with a totally different federal agency when the identical product is manufactured and distributed within the boundaries of a single state. Second, there is a bill pending on Congress that would extend the USDA's jurisdiction under the VSTA to intrastate animal biologics. H.R. 4853, 96th Cong. (1978). There seem to be a number of issues involved in the question of federal regulation of intrastate animal biologics. The field has been unoccupied for over sixty years. If there is to be a change in status quo, Congress is a far more appropriate forum for the resolution of these issues.

Plaintiff has also questioned the FDA's general authority to obtain a search warrant. This decision makes it unnecessary to resolve that issue.

The defendant's motion to dismiss is therefore denied, and a preliminary injunction will issue against the defendant.

This memorandum decision shall constitute the Court's findings of fact and conclusions of law, pursuant to Rule 52 of the Federal Rules of Civil Procedure.