**GRAND LABORATORIES, INC.,**
**Appellee,**

v.

**Patricia HARRIS, Secretary of Health, Education and Welfare, Appellant.**

**No. 80–1331.**

United States Court of Appeals,
Eighth Circuit.

Submitted Jan. 14, 1981.

Decided March 25, 1981.

Rehearing and Rehearing En Banc Granted May 29, 1981.

---

Sanford M. Litvack, Asst. Atty. Gen., John J. Powers, III, Peter L. De La Cruz, Attys., Dept. of Justice, Washington, D. C., for appellant; John J. Ulrich, Asst. U. S. Atty., Sioux Falls, S. D., of counsel.

Nancy L. Buc, Chief Counsel, Fredrick H. Degnan, Asst. Chief Counsel, for Veterinary Medicine Food and Drug Administration, Rockville, Md.

George T. Qualley, Qualley, Larson & Jones, Sioux Falls, S. D., Philip C. Jones, Harold M. Carter, Alan W. Brick, Qualley, Larson & Jones, Washington, D. C., for appellee.

Before HEANEY, Circuit Judge, GIBSON, Senior Circuit Judge, and ARNOLD, Circuit Judge.

FLOYD R. GIBSON, Senior Circuit Judge.

This case presents the question whether animal biologics constitute drugs within the meaning of the Federal Food, Drug and Cosmetic Act (FDCA), 21 U.S.C. § 321(g)(1) (1976).

## I.

In February 1979, two field officers from the Food and Drug Administration (FDA) attempted to inspect the facilities of Grand Laboratories, Inc. (Grand) in Freeman, South Dakota. They were denied entrance. In August 1979, the FDA obtained a warrant from a United States magistrate to inspect Grand's facility. Before the warrant was enforced, Grand brought suit in the United States District Court for the District of South Dakota seeking declaratory and injunctive relief against the FDA on the grounds that the FDA is without jurisdiction to regulate the manufacture and sale of animal biologics. After issuing a temporary restraining order, the District Court held a hearing on whether a preliminary injunction should issue against the FDA. On February 21, 1980, the District Court filed a memorandum opinion and issued a preliminary injunction. *Grand Laboratories, Inc. v. Harris*, 488 F.Supp. 618 (D.S.D.1980). The Secretary of Health, Education and Welfare filed a timely appeal.

Grand manufactures and distributes animal biologics wholly within the state of South Dakota. Animal biologics are products prepared from animal tissues or fluids or growth of microorganisms, used for the prevention or treatment of disease in animals.

Grand successfully argued in the District Court[1] that Congress granted sole federal regulatory power over the manufacture and sale of animal biologics to the United States Department of Agriculture (USDA) under the Virus, Serum, Toxin Act of 1913, 21 U.S.C. §§ 151–158 (1976). That act provides in part:

It shall be unlawful for any person, firm, or corporation to prepare, sell, barter, or exchange in any place under the jurisdiction of the United States, or to ship or deliver for shipment from one State or Territory or the District of Columbia, any worthless, contaminated, dangerous, or harmful virus, serum, toxin, or analogous product intended for use in the treatment of domestic animals, and no person, firm, or corporation shall prepare, sell, barter, exchange, or ship as aforesaid any virus, serum, toxin, or analogous product manufactured within the United States and intended for use in the treatment of domestic animals, unless and until the said virus, serum, toxin, or analogous product shall have been prepared, under and in compliance with regulations prescribed by the Secretary of Agriculture, at an establishment holding an unsuspended and unrevoked license issued by the Secretary of Agriculture as hereinafter authorized.

21 U.S.C. § 151.

Under the Virus, Serum, Toxin Act of 1913, the USDA has limited commerce clause jurisdiction. The agency does not have jurisdiction over animal biologics manufactured and distributed wholly within one state, even though a component used in the biologic may have passed through interstate commerce. *See Animal Health Institute v. USDA*, 487 F.Supp. 376 (D.Colo.1980).

The FDA contended in the District Court that animal biologics were drugs within the meaning of the FDCA. The FDCA defines the term "drug" as follows:

(g)(1) The term "drug" means (A) articles recognized in the official United States Pharmacopoeia, official Homoeopathic Pharmacopoeia of the United States, or official National Formulary, or any supplement to any of them; and (B) articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals; and (C) articles (other than food) intended to affect the structure or any function of the body of man or other animals; and (D) articles intended for use as a component of any article specified in clauses (A), (B), or (C) of this paragraph; but does not include devices or their components, parts, or accessories.

21 U.S.C. § 321(g)(1) (1976).

The FDA argued in the District Court that because animal biologics were drugs within the meaning of the FDCA the agency retained jurisdiction over their intrastate manufacture. The FDA conceded that 21 U.S.C. § 392(b) (1976) deprived it of jurisdiction over the interstate manufacture and distribution of animal biologics.[2] *See post* at 7–8. The District Court, however, disagreed with the FDA's premise that animal biologics were drugs within the meaning of the FDCA. The court based this finding on the statutory history of both the FDCA and the Virus, Serum, Toxin Act of 1913:

The FDA has correctly pointed out that great weight should be given to an agency's construction of a statute. The definition of "drug", however, appears to have already been construed as not encompassing animal biologics. As mentioned above, the USDA procured the passage of the VSTA in 1913. At that time the Food and Drug Act of 1906 was administered by the USDA and the definition of "drug" contained in that act was apparently not viewed as encompassing animal biologics. The basic definition of

1. The Honorable Fred J. Nichol, Senior Judge, United States District Court, District of South Dakota.

2. Section 392(b) provides in part: "Nothing contained in this chapter shall be construed as in any way affecting, modifying, repealing, or superseding the provisions of * * * the virus, serum, toxin and analogous products provisions, applicable to domestic animals, of the Act of Congress approved March 4, 1913."

"drug" was not materially changed in the meantime. And the circumstances surrounding the inclusion of the VSTA in section 392(b) indicates that Congress concurred with the USDA interpretation. *Grand Laboratories, Inc.*, 488 F.Supp. at 622.

On appeal, the FDA contends the District Court erred in finding it to be without jurisdiction over the intrastate manufacture and distribution of animal biologics. We find animal biologics not to be drugs within the meaning of the FDCA and affirm the District Court.

## II.

"The starting point in every case involving construction of a statute is the language itself." *Teamsters v. Daniel*, 439 U.S. 551, 558, 99 S.Ct. 791, 795, 58 L.Ed.2d 808 (1979). In spite of the use of animal biologics at the time of the original enactment of the predecessor to the FDCA, the Pure Food Act of 1906, animal biologics were mentioned in neither the statute nor the legislative history of the FDCA, nor in the Pure Food Act of 1906. Despite this lack of any support, in the form of congressional intent, for the inclusion of animal biologics, the FDA maintains that animal biologics are "articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals," and therefore come within the literal definition of section 321(g)(1)(B) of title 21.

■ Neither we nor Grand nor the FDA disagree that a literal reading of the above section includes animal biologics. The "essential question for our determination is whether Congress intended the definition of drug [as set forth in the FDCA] to have the broad coverage" that the literal language would allow. *United States v. Bacto-Unidisk*, 394 U.S. 784, 793, 89 S.Ct. 1410, 1415, 22 L.Ed.2d 726 (1969). Reviewing the legislative history of the FDCA and the Virus, Serum, Toxin Act of 1913 and the lack of prior enforcement activity by the FDA, we find that Congress did not intend to include animal biologics within the meaning of the

definition of the term "drug" in the FDCA. In so finding, we recognize the remedial nature of the FDCA and give due deference to the FDA's interpretation of the act. *Id.*, 394 U.S. at 798, 89 S.Ct. at 1418; *see Teamsters v. Daniel*, 439 U.S. at 566 n.20, 99 S.Ct. at 800; *National Nutritional Foods Association v. Mathews*, 557 F.2d 325, 336 (2d Cir. 1977).

## III.

In reviewing the legislative history of the pertinent acts, we are mindful of the Supreme Court's warning that "[o]nly when a literal construction of a statute yields results so manifestly unreasonable that they could not fairly be attributed to congressional design will an exception to statutory language be judicially implied." *United States v. Rutherford*, 442 U.S. 544, 555, 99 S.Ct. 2470, 2477, 61 L.Ed.2d 68 (1979). In order to fully understand the complex interplay of the FDCA and the Virus, Serum, Toxin Act of 1913, it is necessary to review congressional action in the human as well as the animal biologics area, in relation to congressional regulation of traditional drugs.

Federal regulation of human biologics began in 1902 when Congress enacted a statute prohibiting the importation or interstate shipment of any virus, serum, toxin, antitoxin, or analogous products unless licensed by the Treasury Department and properly labelled. Act of July 1, 1902, ch. 1378, 32 Stat. 728. Four years later, Congress enacted the Pure Food Act of 1906, ch. 3915, 34 Stat. 768. The act contained a broad definition of the term "drug" which was continued in the FDC Act of 1938. Neither the statutory history of the human biologics act of 1902 nor of the Pure Food Act of 1906 contain any cross-references to each other. The Pure Food Act appears to have been enacted with the intention of being independent of any of the provisions of the human biologics act enacted in 1902.

In 1913, Congress passed the Virus, Serum, Toxin Act of 1913. The FDA admits that the legislative history contains no dis-

cussion of the Virus, Serum, Toxin Act's relationship to the Pure Food Act of 1906. In 1938, Congress strengthened the FDA's power to protect the public from dangerous drugs by enacting the FDC Act. Once again neither the statute itself nor its history contains any reference to animal biologics.[3] Section 902(c) of the FDCA, however, did provide that the act did not affect, modify, or supersede the 1902 act regulating human biologics, but this section was later subject to the congressional revision of the human biologics act in 1944. *See post* at 8. No reference was made at that time to animal biologics, but section 902(c) was later amended, in 1968, to include the Virus, Serum, Toxin Act of 1913 relating to animal biologics. The amendment exempted the 1913 (animal biologics) act from the jurisdiction and coverage of the FDCA.

Section 902(c) is now codified, as amended, at 21 U.S.C. § 392(b) (1976), which provides:

(b) Nothing contained in this chapter shall be construed as in any way affecting, modifying, repealing, or superseding the provisions of section 262 of Title 42 (relating to viruses, serums, toxins, and analogous products applicable to man); the virus, serum, toxin, and analogous products provisions, applicable to domestic animals, of the Act of Congress approved March 4, 1913; the Filled Cheese Act of June 6, 1896, the Filled Milk Act of March 4, 1923; or the Import Milk Act of February 15, 1927.

The first explicit congressional connection between the Virus, Serum, Toxin Act of 1913 and the FDCA occurred with the passage of the Animal Drug Amendments of 1968, Pub.L. No. 90–399, § 107, 82 Stat. 342 (codified at 21 U.S.C. § 392(b) (1976)). This amendment expanded the "not affecting, modifying, repealing or superseding" language to include the Virus, Serum, Toxin Act of 1913.

Our review of the statutory history of the meaning of the term "drug" in the FDCA and its forerunner, the Pure Food Act of 1906, reveals that for a period of over 55 years, Congress never considered animal biologics to be drugs under the FDA's jurisdiction. In fact, when the relationship between human biologics and the FDCA was first explicitly considered in 1944, Congress reacted by making clear that human biologics were to be subject to the FDCA. In the Virus, Serum, and Toxin Act of 1944, ch. 373, Title III, § 351, 58 Stat. 702, relating to human biologics, Congress intended that the FDCA also apply to human biologics.[4] "Subsection (g) [of § 351, codified at 42 U.S.C. § 262(g) (1976)] is an explicit statement, confirming the present legal situation, that products subject to this section are not exempted from the Federal Food, Drug, and Cosmetic Act, * * *."[5] H.R. Rep. No. 1364, 78th Cong., 2d Sess. ——, *reprinted in* [1944] U.S.Code Cong.Serv. 1211, 1234; *see United States v. Calise*, 217 F.Supp. 705, 708–09 (S.D.N.Y.1962) (human blood both a drug and a human biologic).

---

**3.** Originally, responsibility for enforcement of the Pure Food and Drug Act of 1906, the Virus, Serum, Toxin Act of 1913, and the FDCA of 1938 were placed in divisions of the Department of Agriculture. These were, respectively, the Bureau of Chemistry, the Bureau of Animal Husbandry, and the Food and Drug Administration. Subsequently, the FDA became part of the Department of Health, Education and Welfare, now Health and Human Services. *See Grand Laboratories, Inc.*, 488 F.Supp. at 620–21.

**4.** Jurisdiction to enforce the human biologics acts originally was placed in the Public Health Service, which in 1902 was a division of the Treasury Department. In 1939 the Public Health Service was transferred from Treasury to the newly created Federal Security Agency

which was transferred to Health, Education and Welfare, now Health and Human Services. In 1940, the FDA and its functions were transferred to the Federal Security Agency. Therefore, as contrasted with animal biologics, *see* note 3, *supra*, human biologics, both as a drug under the FDCA and as human biologics under the 1944 act, have been administered by the same department since the date of the enactment of the 1944 act. *See Grand Laboratories, Inc.*, 488 F.Supp. at 620–21.

**5.** 42 U.S.C. § 262(g) provides: "Nothing contained in this chapter shall be construed as in any way affecting, modifying, repealing, or superseding the provisions of the Federal Food, Drug, and Cosmetic Act."

Later, in 1968, when Congress considered the relationship between the FDCA and animal biologics, the reaction was markedly different. The FDA admits that section 107 of the Animal Drug Amendments of 1968, codified at 21 U.S.C. § 392(b) added the Virus, Serum, Toxin Act of 1913 "to the exempting provisions of section 902(c) of the FDC Act, 21 U.S.C. § 392(b)." Appellant's brief at 20. As stated by the District Court, the "intended effect of section 392(b) [1968 amendment] is maintenance of the status quo." *Grand Laboratories, Inc.*, 488 F.Supp. at 622. We agree. Animal biologics are not to be considered drugs within the meaning of the FDCA.

## IV.

The FDA also argues that we should defer to its interpretation of the meaning of the term "drug" in the FDCA, the statute which the FDA is responsible for administering. "But there are limits, grounded in the language, purpose, and history of the particular statute, on how far an agency may go in its interpretative role." *Teamsters v. Daniel*, 439 U.S. at 566, 99 S.Ct. at 794. Since 1938, the FDA has acknowledged in regulations that animal biologics subject to the Virus, Serum, Toxin Act of 1913 "shall not be deemed subject" to the drug provisions of the FDCA. 3 Fed.Reg. 1847 § 1.02 (1938); 21 Fed.Reg. 5577 § 130.2 (1956). Even the FDA's regulations dealing with enforcement actions do not explicitly include animal biologics within their scope. 21 C.F.R. § 7.1(f) (1980) defines products to include "an article subject to the jurisdiction of the Food and Drug Administration, including any food, drug, and device intended for human or animal use, any cosmetic and biologic intended for human use, * *." If the FDA considered all biologics, both animal and human, to be within its jurisdiction, there would have been no need to modify the term biologic by the phrase "intended for human use." Not until 1979 did the FDA, through litigation, attempt to exert any jurisdictional authority over animal biologics.

The FDA argues that excluding animal biologics from inclusion in the FDCA would result in a "loophole" in the regulation of intrastate animal biologics. Congress, in passing the Virus, Serum, Toxin Act of 1913, did not fully exercise its power under the commerce clause, as construed in later Supreme Court decisions. *See, e. g., Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 258–59, 85 S.Ct. 348, 358, 13 L.Ed.2d 258 (1964); *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 36–41, 57 S.Ct. 615, 624, 81 L.Ed. 893 (1937). Animal biologics manufactured and distributed wholly in one state remain free from the strictures of federal regulation. The legislative issue over whether a modern-day "loophole" exists is unrelated to the judicial question of whether animal biologics were included in the meaning of the term "drug" in the Pure Food Act of 1906 and later the FDCA.

In short, Congress has created any so-called "loophole" in the federal regulation of intrastate animal biologics. It is therefore for Congress,[6] and not the Judicial branch, to remedy the situation if it sees fit to do so.

## V.

The existence of the Virus, Serum, Toxin Act of 1913, coupled with the FDA's lack of enforcement activity during the past century, severely undercut all arguments for extending the FDCA to animal biologics. The statutory history leaves little doubt but that Congress believed it was filling a regulatory void when it enacted the Virus, Serum, Toxin Act of 1913. If Congress believed animal biologics were included within the term "drug" in the Pure Food and Drug Act of 1906, there would have been no need for a separate animal biologics act. Even if additional regulatory powers were perceived to be needed in the area of animal biologics, Congress could have remedied the

6. In the last session of Congress, a bill was introduced to expand the jurisdiction of the United States Department of Agriculture to the intrastate manufacture and distribution of animal biologics. H.R. 4853, 96th Cong. (1978).

matter by amending the 1906 act. Instead, Congress enacted a separate, independent statute to regulate animal biologics. *Cf. Teamsters v. Daniel,* 439 U.S. at 569–70, 99 S.Ct. at 801–802. Animal biologics were not thought to be regulated under the Pure Food Act of 1906 and the FDC Act of 1938 at the time of their enactment. Animal biologics have been accorded separate and different treatment under the Virus, Serum, Toxin Act of 1913 from the treatment accorded more traditional medications under the FDCA. Animal biologics at this time do not constitute drugs within the meaning of the FDCA. If federal jurisdiction is deemed advisable, Congress can fill this alleged void at any time it seems fit.

Affirmed.

ARNOLD, Circuit Judge, dissenting.

The Food and Drug Act of 1906, 34 Stat. 768, 769, defines "drug," in pertinent part, as "any substance or mixture of substances intended to be used for the cure, mitigation, or prevention of disease of either man or other animals." This definition has been carried forward into present law without significant change. Section 201(g) of the Federal Food, Drug, and Cosmetic Act, 52 Stat. 1040, 21 U.S.C. § 321(g), now reads as follows:

> (g)(1) The term "drug" means ... (B) articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals ....

This case concerns animal biologics, admittedly used for the prevention or treatment of disease in animals. The particular product around which the dispute here centers is known as "porcine mastitis-metritis-arthritis-infertility bacterin." This bacterin contains, among other ingredients, aluminum hydroxide, which, according to evidence introduced in the court below, was purchased by the plaintiff Grand Laboratories, Inc., from a chemical firm in New Jersey and then shipped to South Dakota for use in the manufacturing process.

There is thus no doubt, and the Court raises none, that the product involved here is within the literal definition of "drug" that Congress has adopted. As I read its opinion, the Court declines to apply the words of the statute as written for two main reasons: (1) the interpretation thus produced is unreasonable; and (2) Congress, by its actions in later years, primarily in 1913 and 1968, has showed that it really did not mean what it said in 1906. Because I cannot agree that the literal language of the statute should not be applied in the circumstances of this case, I respectfully dissent.

I start with the proposition, recently repeated by the Supreme Court, that

> When we find the terms of the statute unambiguous, judicial inquiry is complete, except "in 'rare and exceptional circumstances.'" *TVA v. Hill,* 437 U.S. 153, 187 n. 33, 98 S.Ct. 2279, 2298 n. 33, 57 L.Ed.2d 117 (1978) (quoting *Crooks v. Harrelson,* 282 U.S. 55, 60, 51 S.Ct. 49, 50, 75 L.Ed. 156 (1930)).

*Rubin v. United States,* —— U.S. ——, ——, 101 S.Ct. 698, 700, 66 L.Ed.2d 633 (1981).[1] That Court has affirmed this principle with special force in respect of the very definition at issue in this case. In *United States v. An Article of Drug ... Bacto-Unidisk ....,* 394 U.S. 784, 89 S.Ct. 1410, 22 L.Ed.2d 726 (1969), the question was whether a laboratory aid known as an antibiotic sensitivity disc, used in a screening test for help in determining the proper antibiotic drug to administer to patients, was a "drug" within the meaning of 21 U.S.C. § 321(g)(1)(B), notwithstanding the fact that it was used exclusively in laboratory work and never came in contact with any part of the patient's body. The Supreme Court reversed holdings by two courts below that the antibiotic discs were not drugs. The Court said:

> ... Congress fully intended that the Act's coverage be as broad as its literal language indicates ....

1. See also *United States Railroad Retirement Bd. v. Fritz,* —— U.S. ——, ——, 101 S.Ct. 453, 463, 66 L.Ed.2d 368 (1980): "the language of the statute is clear, and we have historically assumed that Congress intended what it enacted."

394 U.S. at 798, 89 S.Ct. at 1418. The Court also referred, *ibid.*, to "the well-accepted principle that remedial legislation such as the Food, Drug, and Cosmetic Act is to be given a liberal construction consistent with the Act's overriding purpose to protect the public health . . . ."

The significance of this holding for present purposes is enhanced when it is recalled that the effect of a contrary holding in *Bacto-Unidisk* would probably not have been to exempt the discs from regulation altogether, since, if they had not been held to be "drugs," they would almost certainly have been considered "devices," and thus subject to regulation, though to a lesser extent, under another provision of the statute. Here, by contrast, the Court's holding that animal biologics are not "drugs" leaves those substances, in cases where they are not actually shipped in their finished form across state lines, entirely free of all federal regulation.

The Court persuasively argues that the result advocated by the Food and Drug Administration here would be illogical, in that certain kinds of animal biologics, those shipped across state lines, would be regulated by the Department of Agriculture, whereas certain other kinds, those not shipped across state lines but composed in part of ingredients that had been so shipped, would be regulated by the Food and Drug Administration. The resulting regulatory scheme, to be sure, is not so symmetrical as it could be, and if one were casting a vote in Congress, the arguments for placing the regulation of all animal biologics in the Department of Agriculture, as opposed to the Food and Drug Administration, would be strong indeed. It seems to me, however, that judges should usually resist the temptation to superimpose their own ideas of reason and logic on the clear words of a congressional enactment. I cannot bring myself to believe that a literal construction of this statute would yield "results so manifestly unreasonable that they could not be attributed to congressional design . . . ." *United States v. Rutherford,* 442 U.S. 544, 555, 99 S.Ct. 2470, 2477, 61 L.Ed.2d 68 (1979). It is no more reasonable, in my view, to conclude that Congress, despite the concededly unambiguous words of the 1906 statute, did not intend in that enactment to regulate animal biologics at all.

It is true that the construction of the statute I am arguing for leaves some questions unanswered about the subsequent conduct of the Congress. If, for example, animal biologics had already been regulated by the Act of 1906, why did Congress, in the Virus, Serum, Toxin Act of 1913, now codified as 21 U.S.C. §§ 151–58, subject those products, when shipped interstate, to regulation by the Department of Agriculture? The question is a fair one, and I do not know the answer. I do suggest, however, that when Congress enacts two provisions with respect to a given subject that appear to be inconsistent or conflicting, it is our duty to harmonize the provisions and to give effect to both of them to the extent possible. Here, the 1913 Act can be given full effect as written, without superseding the jurisdiction previously conferred over products of the kind at issue in this case by the 1906 Act. The Court rightly directs our attention to the Animal Drug Amendments of 1968, § 107 of which, 82 Stat. 342, is now codified at 21 U.S.C. § 392(b). This provision makes clear that the Food, Drug, and Cosmetic Act does not affect, modify, repeal, or supersede the Virus, Serum, Toxin Act of 1913. The Court reads these words as indicating a general intention on the part of Congress not to regulate animal biologics at all except as expressly provided in the 1913 Act. The words need not be so read. Their literal meaning is simply to leave the regulation of animal biologics shipped across state lines in the Department of Agriculture, where it had been since 1913. No reference is made to the Act of 1906, and no such reference should be implied, in view of the universally received doctrine that repeals by implication are not favored.

It is perfectly true, as the Court observes, *ante,* pp. 734–735, that Congress can act to fill the void created by this case, if it is a void. It is equally true that Congress could overrule a holding by the courts that the

Food and Drug Administration has the power to regulate animal biologics sold intrastate. The real question is, who shall bear the risk that, for reasons of inertia or otherwise, Congress may not act at all? I would prefer that risk be borne by the private parties seeking to avoid all federal regulation, rather than by the public agency seeking to defend the public health. No doubt there are cases when the literal meaning of a statute is absurd, and we are not, in those instances, obliged to abandon our common sense. In most cases, however, the safer course is to apply the law as written, secure in the knowledge that if we do so we cannot justly be accused of usurpation, and that a power exists that can correct us. In short, I believe this is a case in which we should apply the aphorism of Mr. Justice Holmes that "we do not inquire what the legislature meant; we ask only what the statute means." Holmes, Collected Legal Papers 207 (1920).

I would reverse the judgment below.[2]

---

**2.** The Court also argues, *ante*, p. 734, that "[s]ince 1938, the FDA has acknowledged in regulations that animal biologics subject to the Virus, Serum, Toxin Act of 1913 'shall not be deemed subject' to the drug provisions of the FDCA." As I understand the cited regulation, however, it did not disclaim altogether any FDA jurisdiction over animal biologics, but simply provided that "a new drug shall not be deemed subject to … the [FDC] Act, if it is subject to the [VSTA] …." 3 Fed.Reg. 1847, § 1.02 (1938). It is undisputed that the animal biologics at issue here are not subject to the VSTA. The clear implication of the Department of Agriculture's 1938 regulation, therefore, is that these biologics are subject to the FDCA.