**GRAND LABORATORIES, INC.,**
**Appellee,**

v.

**Patricia HARRIS, Secretary of Health, Education, and Welfare, Appellant.**

**No. 80–1331.**

United States Court of Appeals,
Eighth Circuit.

Submitted June 15, 1981.

Decided Oct. 2, 1981.

Rehearing and Rehearing En Banc
Denied Nov. 3, 1981.

John J. Powers, III, Atty., Dept. of Justice, Washington, D. C., for appellant.

Harold Carter, Washington, D. C., for appellee.

Before LAY, Chief Judge, and HEANEY, BRIGHT, ROSS, STEPHENSON, HENLEY, McMILLIAN and ARNOLD, Circuit Judges, en banc.

ARNOLD, Circuit Judge.

This is a suit by Grand Laboratories, Inc., to enjoin the Food and Drug Administration from inspecting its facilities in South Dakota. Grand manufactures animal biologics, which are products prepared from animal tissues or fluids, or from microorganisms, and used for the prevention or treatment of disease in animals. Plaintiff distributes its product wholly within the state of South Dakota, but some ingredients are shipped interstate to Grand's laboratory. The FDA argued that it had the right to inspect Grand's facilities because animal biologics are "drugs" within the meaning of the Food, Drug, and Cosmetic Act, 21 U.S.C. § 321(g)(1)(B), which defines "drug" to include "articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals . . . ." The District Court relying on later Acts of Congress which will be detailed below, disagreed with FDA and held that animal biologics are not "drugs" for present purposes. It therefore issued the injunction prayed for. *Grand Labs., Inc. v. Harris*, 488 F.Supp. 618 (D.S.D.1980). A panel of this Court affirmed, one judge dissenting. *Grand Labs., Inc. v. Harris*, 644 F.2d 729 (8th Cir. 1981). We then granted the FDA's petition for rehearing en banc, and now, after hearing argument, we reverse the District Court.

## I.

An understanding of the issue presented in this case requires a brief summary of statutory law in the field of drugs and biologics. A number of relevant propositions are undisputed. Laboratories making animal biologics for sale interstate are subject to regulation by the Department of Agriculture, and have been since the enactment of the Virus, Serum, and Toxin Act of 1913 (VSTA), 21 U.S.C. §§ 151–58. That Act provides in part:

It shall be unlawful for any person, firm, or corporation to prepare, sell, barter, or exchange in any place under the jurisdiction of the United States, or to ship or deliver for shipment from one State or Territory or the District of Columbia, any worthless, contaminated, dangerous, or harmful virus, serum, toxin, or analogous product intended for use in the treatment of domestic animals, and no person, firm, or corporation shall prepare, sell, barter, exchange, or ship as aforesaid any virus, serum, toxin, or analogous product manufactured within the United States and intended for use in the treatment of domestic animals, unless and until the said virus, serum, toxin, or analogous product shall have been prepared, under and in compliance with regulations prescribed by the Secretary of Agriculture, at an establishment holding an unsuspended and unrevoked license issued by the Secretary of Agriculture as hereinafter authorized.

21 U.S.C. § 151.

It is agreed, on the other hand, that the VSTA does not authorize the Agriculture Department to regulate animal biologics manufactured and distributed wholly within one state, as Grand's products are, even if a component used in the biologic has passed through interstate commerce. See *Animal Health Inst. v. USDA*, 487 F.Supp. 376 (D.Colo.1980).

It is also clear that all animal biologics, whether interstate or intrastate, are within the literal definition of "drug" in FDA's governing statute, the Food, Drug, and Cosmetic Act of 1938. That definition, in full, is as follows:

(g)(1) The term "drug" means (A) articles recognized in the official United States Pharmacopoeia, official Homoeopathic Pharmacopoeia of the United States, or official National Formulary, or any supplement to any of them; and (B) articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals; and (C) articles (other than food) intended to affect the structure or any function of

the body of man or other animals; and (D) articles intended for use as a component of any article specified in clauses (A), (B), or (C) of this paragraph; but does not include devices or their components, parts, or accessories.

21 U.S.C. § 321(g)(1). The portion of this definition that is relevant for present purposes originated in the Food and Drug Act of 1906, 34 Stat. 768, 769, which defined "drug" to include "any substance or mixture of substances intended to be used for the cure, mitigation, or prevention of disease of either man or other animals."

In an attempt to harmonize these provisions, both sides point to Section 902(c) of the Food, Drug, and Cosmetic Act (FDCA), as amended in 1968, 21 U.S.C. § 392(b). This statute provides:

(b) Nothing contained in this chapter shall be construed as in any way affecting, modifying, repealing, or superseding the provisions of section 262 of Title 42 (relating to viruses, serums, toxins, and analogous products applicable to man); the virus, serum, toxin, and analogous products provisions, applicable to domestic animals, of the Act of Congress approved March 4, 1913; the Filled Cheese Act of June 6, 1896, the Filled Milk Act of March 4, 1923; or the Import Milk Act of February 15, 1927.

Thus, we know that the FDCA does not modify or affect the power of the Department of Agriculture under the VSTA of 1913 over interstate animal biologics. Grand contends, and the District Court held, that Section 902(c) also bars FDA from regulating intrastate animal biologics. (It is agreed that the FDCA, read without reference to the harmonizing clause contained in Section 902(c), would validly give FDA power to regulate animal biologics sold intrastate, if an ingredient of the products had previously been transported interstate.) Under Grand's view, it is subject to no federal regulation. FDA, on the other hand, would read Section 902(c) more literally. If a product is not subject to the

VSTA (as intrastate animal biologics are not), it must, according to FDA, remain subject to its jurisdiction under the FDCA, assuming the product is within the words of the FDCA's definition of "drug" (as intrastate animal biologics concededly are). FDA's view, if accepted, would subject both interstate and intrastate animal biologics to federal regulation, although, perhaps anomalously, the regulation would be by different agencies.

## II.

This case concerns products admittedly used for the prevention or treatment of disease in animals. The particular product around which the dispute here centers is known as "porcine mastitis-metritis-arthritis-infertility bacterin." This bacterin contains, among other ingredients, aluminum hydroxide (itself a "drug"), which, according to evidence introduced in the court below, was purchased by the plaintiff Grand Laboratories, Inc., from a chemical firm in New Jersey and then shipped to South Dakota for use in the manufacturing process.

There is thus no doubt that the product involved here is within the literal definition of "drug" that Congress has adopted. Grand urges us not to apply the words of the statute as written for two main reasons: (1) the interpretation thus produced is unreasonable; and (2) Congress, by its actions in later years, primarily in 1913 and 1968, has shown that it really did not mean what it said in 1906.

We start with the proposition, recently repeated by the Supreme Court, that

When we find the terms of the statute unambiguous, judicial inquiry is complete, except "in 'rare and exceptional circumstances.'" *TVA v. Hill*, 437 U.S. 153, 187, n. 33 [98 S.Ct. 2279, 2298, n.33, 57 L.Ed.2d 117] (1978) (quoting *Crooks v. Harrelson*, 282 U.S. 55, 60, [51 S.Ct. 49, 50, 75 L.Ed. 156] (1930)).

*Rubin v. United States*, 449 U.S. 424, 430, 101 S.Ct. 698, 701, 66 L.Ed.2d 633 (1981).[1] That Court has affirmed this prin-

---

1. See also *United States Railroad Retirement Bd. v. Fritz*, 449 U.S. 166, 179, 101 S.Ct. 453, 461, 66 L.Ed.2d 368 (1980): "the language of

the statute is clear, and we have historically assumed that Congress intended what it enacted."

ciple with special force in respect of the very definition at issue in this case. In *United States v. An Article of Drug ... Bacto-Unidisk ...*, 394 U.S. 784, 89 S.Ct. 1410, 22 L.Ed.2d 726 (1969), the question was whether a laboratory aid known as an antibiotic sensitivity disc, used in a screening test for help in determining the proper antibiotic drug to administer to patients, was a "drug" within the meaning of 21 U.S.C. § 321(g)(1)(B), notwithstanding the fact that it was used exclusively in laboratory work and never came in contact with any part of the patient's body. The Supreme Court reversed holdings by two courts below that the antibiotic discs were not drugs. The Court said:

> ... Congress fully intended that the Act's coverage be as broad as its literal language indicates ....

394 U.S. at 798, 89 S.Ct. at 1418. The Court also referred, *ibid.*, to "the well-accepted principle that remedial legislation such as the Food, Drug, and Cosmetic Act is to be given a liberal construction consistent with the Act's overriding purpose to protect the public health ...."

The significance of this holding for present purposes is enhanced when it is recalled that the effect of a contrary holding in *Bacto-Unidisk* would probably not have been to exempt the discs from regulation altogether, since, if they had not been held to be "drugs," they would almost certainly have been considered "devices," and thus subject to regulation, though to a lesser extent, under another provision of the statute. Here, by contrast, a holding that animal biologics are not "drugs" would leave those substances, in cases where they are not actually shipped in their finished form across state lines, entirely free of all federal regulation.

The District Court ably argued that the result advocated by the Food and Drug Administration here would be illogical, in that certain kinds of animal biologics, those shipped across state lines, would be regulat-ed by the Department of Agriculture, whereas certain other kinds, those not shipped across state lines but composed in part of ingredients that had been so shipped, would be regulated by the Food and Drug Administration. The resulting regulatory scheme, to be sure, is not so symmetrical as it could be, and if one were casting a vote in Congress, the arguments for placing the regulation of all animal biologics in the Department of Agriculture, as opposed to the Food and Drug Administration, would be strong indeed. It seems to us, however, that judges should usually resist the temptation to superimpose their own ideas of reason and logic on the clear words of a congressional enactment. We do not believe that a literal construction of this statute yields "results so manifestly unreasonable that they could not be attributed to congressional design ...." *United States v. Rutherford*, 442 U.S. 544, 555, 99 S.Ct. 2470, 2477, 61 L.Ed.2d 68 (1979). It is no more reasonable, in our view, to conclude that Congress, despite the concededly unambiguous words of the 1906 statute, did not intend in that enactment to regulate animal biologics at all.

It is true that this construction of the statute leaves some questions unanswered about the subsequent conduct of the Congress. If, for example, animal biologics had already been regulated by the Act of 1906, why did Congress, in the Virus, Serum, Toxin Act of 1913 subject those products, when shipped interstate, to regulation by the Department of Agriculture? The question is a fair one, and we do not know the answer for certain. We do suggest, however, that when Congress enacts two provisions with respect to a given subject that appear to be inconsistent or conflicting, it is our duty to harmonize the provisions and to give effect to both of them to the extent possible. Here, the 1913 Act can be given full effect as written, without superseding the jurisdiction previously conferred over products of the kind at issue in this case by

the 1906 Act. Grand rightly directs our attention to the Animal Drug Amendments of 1968, § 107 of which, 82 Stat. 342, is now codified at 21 U.S.C. § 392(b). This provision makes clear that the Food, Drug, and Cosmetic Act does not affect, modify, repeal, or supersede the Virus, Serum, Toxin Act of 1913. Plaintiff reads these words as indicating a general intention on the part of Congress not to regulate animal biologics at all except as expressly provided in the 1913 Act. The words need not be so read. Their literal meaning is simply to leave the regulation of animal biologics shipped across state lines in the Department of Agriculture, where it had been since 1913. No reference is made to the Act of 1906, and no such reference should be implied, in view of the universally received doctrine that repeals by implication are not favored.

It is perfectly true that Congress can act to cure the anomaly of FDA regulation of intrastate animal biologics, if it is an anomaly. It is equally true that Congress could overrule a holding by the courts that the Food and Drug Administration has the power to regulate animal biologics sold intrastate. The real question is, who shall bear the risk that, for reasons of inertia or otherwise, Congress may not act at all? We think it better that the risk be borne by the private parties seeking to avoid all federal regulation, rather than by the public agency seeking to defend the public health. No doubt there are cases when the literal meaning of a statute is absurd, and we are not, in those instances, obliged to abandon our common sense. In most cases, however, the safer course is to apply the law as written, secure in the knowledge that if we do so we cannot justly be accused of usurpation, and that a power exists that can correct us. In short, this is a case in which we should apply the aphorism of Mr. Justice Holmes that "[w]e do not inquire what the legislature meant; we ask only what the statute means." Holmes, *The Theory of Legal Interpretation,* 12 Harv.L.Rev. 417, 419 (1899).

## III.

The judgment of the District Court is reversed, and this cause is remanded to it with instructions to dismiss Grand's complaint.

HEANEY, Circuit Judge, with whom BRIGHT, Circuit Judge, joins, dissenting.

Human biologics have been regulated since 1902 by a succession of agencies leading to what is now the Food and Drug Administration (FDA), and animal biologics have been regulated since 1913 by the Department of Agriculture (USDA).[1] Throughout this period, animal biologics manufactured and distributed exclusively within a state ("intrastate" products)[2] have been exempt from all federal regulation because they were exempted by Congress from the USDA's jurisdiction. *See Animal Health Inst. v. USDA,* 487 F.Supp. 376 (D.Colo.1980). The FDA for the first time now claims jurisdiction over such intrastate products, asserting latent statutory authority which has laid dormant for more than seventy years. Although we share the majority's belief that all animal biologics should be subject to federal regulation, we cannot find authority for the FDA to claim jurisdiction over those that only flow in intrastate commerce. The jurisdiction principle transcends any consideration of our personal preferences—the FDA cannot invoke regulatory jurisdiction that Congress has exclusively conferred upon another agency. Moreover, the practical result of the majority's decision appears so unreasonable that no Congress could have intended it—one agency with nearly seventy years of experience regulating animal biologics will

---

1. The district court decision by Judge Nichol sets forth an excellent summary of the complex administrative history of this regulatory subject. *See* 488 F.Supp. 618, 621–626 (D.S.D. 1980).

2. One ingredient of the animal biologics at issue in this case appears to be shipped in interstate commerce, which is necessary to the FDA's asserted jurisdiction. The biologics are nonetheless deemed "intrastate" to reflect the basis for their exemption from USDA jurisdiction. *See supra* at 1289–1290.

continue to regulate such products in interstate commerce, while a separate agency will now develop and duplicate the same expertise in order to regulate the same products as they move in intrastate commerce. Our shared desire to see the intrastate animal biologics regulated by the federal government cannot outweigh the plain intent of Congress nor the common sense of sound public administration. We therefore dissent.

## I.

As the majority emphasizes, animal biologics come within the definition of "drug" in the Food, Drug and Cosmetic Act (FDCA) and, therefore, nominally come within the FDA's jurisdiction. *Supra* at 1289, 1290. It is clear that the facial scope of the FDCA reaches animal biologics in both interstate and intrastate commerce. *Id.* A literal application of the FDCA, however, must account for section 902(c) of the Act, now codified, as amended, at 21 U.S.C. § 392(b), which the majority acknowledges but which bears repeating here:

> (b) Nothing contained in this chapter shall be construed as *in any way affecting, modifying, repealing, or superseding* the provisions of section 262 of Title 42 (relating to viruses, serums, toxins, and analogous products applicable to man); the virus, serum, toxin, and analogous products provisions, applicable to domestic animals, of *the Act of Congress approved March 4, 1913*; the Filled Cheese Act of June 6, 1896, the Filled Milk Act of March 4, 1923; or the Import Milk Act of February 15, 1927. [Emphasis added.]

The 1913 Act that the FDCA shall not "affect or modify" is the Virus-Serum-Toxin Act of 1913 (VSTA), which confers upon the USDA jurisdiction over animal biologics. Both the district court and the Circuit Court panel read this "shall not affect" language as affirming the status quo—which since 1913 has meant animal biologics are regulated exclusively by the USDA.[3] The FDA contends, and the majority now

agrees, that the VSTA will not be "affected or modified" if the FDA regulates intrastate animal biologics because such products have always been exempt from the USDA's jurisdiction under that Act. *Supra* at 1290–1292. When Congress provides that the VSTA shall govern animal biologics and that the FDCA "shall not affect" the VSTA, it seems plain to us that the FDCA cannot be authority to regulate what the VSTA exempts. Indeed, the "shall not affect" language is a restriction on FDA jurisdiction, not a grant of authority. Even more persuasive is the fact that the FDA's contention is contrary to the legislative history on this question, to the FDA's prior longstanding interpretation of its jurisdiction and to the only case law construing the intent of Congress with respect to animal biologics.

The FDA's claim of authority arises from the jurisdictional definition of "drug" in the Pure Food and Drug Act of 1906. *Supra* at 1289, 1290. Although animal biologics were in use at the time the 1906 Act was adopted, the FDA can point to nothing in the legislative history of that Act which addresses regulation of such products. Moreover, if Congress intended the 1906 Act to encompass such products, there would have been no need to pass a separate, independent animal biologics act just seven years later—the VSTA of 1913 which confers jurisdiction upon the USDA for such regulation. *Cf., Teamsters v. Daniel*, 439 U.S. 551, 569–570, 99 S.Ct. 791, 801–802, 58 L.Ed.2d 808 (1979). A simple amendment to the 1906 Act, or even no legislative clarification at all, might be consistent with the FDA's assertion of jurisdiction, but passage of a wholly independent act providing separate treatment of such products flatly contradicts the agency's contention. The majority considers this legislative history a source of "unanswered questions," *supra* at 1291, 1292, but it actually provides one clear answer: Congress intended animal biologics to be regulated exclusively pursuant to the 1913 VSTA and not the 1906 Act on which the FDA now relies.

---

3. *See Grand Labs., Inc. v. Harris*, 488 F.Supp. 618 (D.S.D.1980); *Grand Labs., Inc. v. Harris*,

644 F.2d 729 (8th Cir. 1981) (Judge Arnold dissenting).

The longstanding jurisdictional interpretation by the FDA also clashes with its current claim. Since 1938, the FDA has acknowledged in regulations that animal biologics subject to VSTA "shall not be deemed subject" to the drug provisions of the FDCA. 3 Fed.Reg. 1847 § 1.02 (1938); 21 Fed.Reg. 5577 § 130.2 (1956). Even the FDA's regulations dealing with enforcement actions do not explicitly include animal biologics within their scope. For example, 21 C.F.R. § 7.1(f) (1980) defines products to include "an article subject to the jurisdiction of the Food and Drug Administration, including any food, drug, and device intended for human or animal use, any cosmetic and *biologic intended for human use,* * * *." (Emphasis added.) If the FDA considered all biologics, both animal and human, to be within its jurisdiction, there would have been no need to modify the term biologic by the phrase "intended for human use." Not until 1979 did the FDA, through litigation, attempt to assert any jurisdictional authority over animal biologics.

In addition, the only reported case construing the legislative intent of VSTA flatly contradicts the FDA's contention. In *Animal Health Inst. v. USDA,* 487 F.Supp. 376 (D.Colo.1980), the court rejected the claim of a private party that sought to compel the USDA to regulate intrastate animal biologics. The majority cites this case as authority that the USDA cannot regulate such intrastate products, *supra* at 1289, 1290, but ignores the essential rationale on which that decision relied. The court in *Animal Health* ruled that Congress specifically intended to exempt intrastate animal biologics from regulation, noting a long line of USDA administrative decisions in accord with that intent.[4] To permit the FDA to now assert the same jurisdiction wholly negates the intent of Congress. Moreover, such con-

gressional intent underlying the VSTA exemption removes any reasonable doubt concerning section 902(c) of the FDCA —by declaring in section 902(c) that the FDCA shall not "affect or modify" the VSTA, Congress could hardly have intended a change removing VSTA's exemption for intrastate products.

To conclude that Congress intended for exclusive USDA jurisdiction seems inescapable from the foregoing legislative history, administrative practice and judicial precedent.

## II.

Perhaps most compelling are the practical results of permitting FDA jurisdiction in this case, results which appear to be "so manifestly unreasonable that they could not be attributed to congressional design * *." *United States v. Rutherford,* 442 U.S. 544, 555, 99 S.Ct. 2470, 2477, 61 L.Ed.2d 68 (1979). Indeed, the majority concedes that the results may be "illogical," "not symmetrical," and "anomalous." *Supra* at 1290–1292. The consequence of the majority's decision is that the FDA will have exclusive jurisdiction over animal biologics manufactured and distributed within a state's borders and the USDA will have exclusive jurisdiction over the very same products when they cross a state's borders. Thus, two agencies must develop duplicative expertise, train personnel for identical functions, and route inspectors along the same geographic paths—all to regulate products that are only distinguishable by their point of destination. It is difficult to imagine that Congress intended this result when it conferred jurisdiction over the interstate products upon the USDA and exempted the intrastate products from regulation.

In the face of legislative history, prior FDA determinations, judicial precedent and administrative common sense all weighing

4. Although the court found the legislative history of VSTA to be "extremely sparse," it ruled that such history was "supportive of the view that Congress did not intend to require licensing of manufacturers who confine their activities to one state." *Animal Health Inst. v. USDA,* 487 F.Supp. 376, 378 (D.Colo.1980).

After noting that the USDA has, since 1913, interpreted the VSTA as exempting intrastate animal biologics, the court indicated that such an interpretation "is consistent with the literal meaning of [the Act and] follows the intent of Congress." *Id.,* at 379.

in favor of exclusive USDA jurisdiction, the majority turns to the "broad remedial purpose" of the FDCA to find authority for FDA jurisdiction, relying on *United States v. An Article of Drug ... Bacto-Unidisk ..., supra* at 1290–1291. We agree that the FDCA has such a broad purpose and that the Act should be liberally construed to further that purpose. *Bacto-Unidisk* and the policy it espouses, however, simply do not apply to the present case. As the majority notes, the product involved in *Bacto-Unidisk* would either be deemed a "drug" or a "device" within the definition of the FDCA. *Supra* at 1290, 1291. Although the degree of FDA regulation would be more stringent if the product was deemed a "drug," the FDA would clearly have jurisdiction regardless of the definition the product fell under. Here, the question is whether the FDA has any jurisdiction in light of the express grant of authority to the USDA over animal biologics and the express restriction on the FDCA's scope. We cannot accept the conclusion that the general purpose behind a statute provides so sweeping a source of authority that it could outweigh an express restriction imposed within the same statute.

The majority properly notes that Congress has the power to overrule this Court, but then indicates that the risk of congressional inertia should fall on those that would resist federal regulation. *Supra* at 1291, 1292. This sentiment seems misplaced in the present context. It is axiomatic that a regulatory agency has the authority and only such authority as may be conferred upon it by Congress. Where, as here, Congress has granted exclusive jurisdiction to another agency and has chosen to exempt altogether some element of that jurisdiction, there is no "risk of inertia" for courts to allocate—there simply is no authority to regulate the exempted subject matter.

It should be noted that denying the FDA's claim of jurisdiction would not render intrastate biologics free of all regula-

5. The record before us, however, does not reveal the extent of enforcement activity at the state level.

tion, as the majority implies. *Supra* at 1291, 1292. The State of South Dakota has a comprehensive statutory framework that defines the permissible bounds for manufacturing, labeling and distributing a broad range of animal remedies. *See* S.D.Code §§ 39–18–1 to 39–18–53 (1980).[5]

The Congress thus is free to confer intrastate jurisdiction upon the USDA, or even upon the FDA, or to leave such matters in the hands of state authorities as it has since 1913. In any case, because Congress has spoken once, it is for that institution, not the courts, to formulate any new regulatory arrangement.