**IMPRO PRODUCTS, INC., a Minnesota corporation, Appellant,**

v.

**John B. HERRICK; Babson Brothers, Co., an Illinois corporation; Richardson, Meyers and Donofrio, a Maryland corporation; Upjohn Co., a Delaware corporation; and Philips Roxane, Inc., a Delaware corporation, Appellees.**

No. 82–2124.

United States Court of Appeals, Eighth Circuit.

Submitted June 13, 1983.

Decided Aug. 11, 1983.

---

6. *Id.*

7. *Id.*

James Borthwick, Floyd R. Finch, Jr., Blackwell, Sanders, Matheny, Weary & Lombardi, Kansas City, Mo., for appellee Philips Roxane, Inc.; L.W. Rosebrook, Ahlers, Cooney, Dorweiler, Haynie & Smith, Des Moines, Iowa, of counsel.

H.R. Randy Duncan, Lorraine J. May, Duncan, Jones, Riley & Finley, Des Moines, Iowa, for appellee The Upjohn Co.

Randall G. Horstmann, of Nyemaster, Goode, McLaughlin, Emery & O'Brien, P.C., Des Moines, Iowa, for appellee Richardson, Myers & Donofrio, Inc.

Philip C. Jones, Qualley, Larson & Jones, Washington, D.C., George T. Qualley, Qualley, Larson & Jones, Sioux City, Iowa, for appellant Impro Products, Inc.; John F. Daniels, Qualley, Larson & Jones, Kansas City, Mo., Harry L. Capadano, III, Qualley, Larson & Jones, Omaha, Neb., of counsel.

Henry A. Harmon, Mark J. Wiedenfeld, Grefe & Sidney, Des Moines, Iowa, for appellee Babson Bros. Co.

Thomas D. Hanson, Barry A. Russell, Blanchard, Cless, Hanson & Pundt, John Scott, Asst. Atty. Gen., Des Moines, Iowa, for appellee John B. Herrick.

Before HEANEY, Circuit Judge, and HENLEY and BROWN,* Senior Circuit Judges.

HEANEY, Circuit Judge.

Impro Products, Inc., appeals from a district court order granting summary judgment in favor of the defendants on Impro's claims under Sections 1 and 2 of the Sherman Act. The court found no evidence that any of the defendants had conspired to suppress Impro as a competitor in the animal health field. We affirm.

## I.

### BACKGROUND

#### A. THE INDUSTRY STRUCTURE

Antibiotics are used in the animal health industry to treat specific illnesses, and to serve as a health maintenance additive in animal feed. Because antibiotics are drugs within the meaning of the Food, Drug and Cosmetic Act, 21 U.S.C. § 321, they are subject to regulation by the federal Food and Drug Administration (FDA). This regulation extends both to drugs marketed in interstate commerce, and to those marketed in intrastate commerce which contain components that have been shipped interstate.

Animal biologics are products prepared from animal tissues or fluids, or from microorganisms, and are used to prevent or treat disease in animals. Pursuant to the Virus, Serum and Toxin Act of 1913, 21 U.S.C. §§ 151 et seq., the United States Department of Agriculture (USDA) regulates animal biologics distributed in interstate commerce. *Grand Laboratories, Inc. v. Harris,* 660 F.2d 1288, 1289 (8th Cir.1981), *cert. denied,* 456 U.S. 927, 102 S.Ct. 1972, 72 L.Ed.2d 442 (1982). Animal biologics marketed solely in intrastate commerce, however, are subject to regulation by the states, if they choose to exercise such authority, and by the FDA pursuant to the Food, Drug and Cosmetic Act, 21 U.S.C. §§ 301 et seq. See *Grand Laboratories, Inc. v. Harris, supra,* 660 F.2d at 1289–1292.

The significance of these separate federal regulatory schemes is as follows: Antibiotic drugs can be marketed—either interstate or intrastate—only after they have been tested and approved by the FDA. Similarly, animal biologics can be sold in interstate commerce only if they have been licensed by the USDA. Animal biologics, however, can be marketed on an intrastate basis without a USDA license, but they are sub-

---

* The Honorable BAILEY BROWN, United States Senior Circuit Judge for the Sixth Circuit, sitting by designation.

ject to FDA review. *See Grand Laboratories, Inc. v. Harris, supra,* 660 F.2d at 1290–1292; *id.* at 1293–1295 (Heaney, J., dissenting).

## B. THE PLAINTIFF

Impro Products, Inc., is a Minnesota corporation with its principal place of business in Waukon, Iowa. It produces and markets a variety of animal biologics containing whey antibodies.[1] It classifies its products into three categories: (1) food supplements which are intended to increase milk production in dairy cattle and which are marketed in interstate commerce; (2) whey blends which are intended to prevent and control infections in animals and which are marketed on an intrastate basis; and (3) teat dips (containing no whey antibodies) which are sold in interstate commerce.

## C. DEFENDANT HERRICK

Dr. John Herrick, during the events in question here, was a USDA extension veterinarian, and a tenured professor of veterinary science at Iowa State University. He is a past president of the American Veterinary Medical Association and has been a member of many veterinary groups, farm organizations and industry associations.

Dr. Herrick's primary function as a USDA extension veterinarian on the Iowa State University staff was to accumulate information on current developments and problems in the animal health care field and to disseminate that information to farmers, government officials, veterinarians, academicians and industry representatives in the animal health field.

Between 1966 and 1976, Dr. Herrick entered into consulting arrangements with each of the corporate defendants. None of them, however, knew that Dr. Herrick had similar consulting arrangements with the other corporate defendants until this lawsuit was filed. Between November, 1959, and the spring of 1962, Dr. Herrick also was in communication with Impro officials concerning the use, efficacy and commercial possibilities of Impro's products. Impro contends that Dr. Herrick ceased rendering any assistance to the company after it refused his request in 1962 for a monthly consulting fee of $100. Dr. Herrick denies making such a request.

## D. THE CORPORATE DEFENDANTS[2]

### 1. *Babson Brothers Company*

Babson is an Illinois corporation with its principal place of business in Oakton, Illinois. It markets milking equipment, related dairy supplies, and teat dips. It does not manufacture or distribute any antibiotics, vaccines or serums. Babson retained Dr. Herrick beginning in 1976 to author a column in its publication *Dairy Illustrated,* to author a book on milking principles, to be available for speaking engagements and meetings, and to otherwise act as a consultant for the company. Babson paid Dr. Herrick a monthly fee of $500, plus travel expenses.

### 2. *Richardson, Meyers and Donofrio, Inc. (RM & D)*

RM & D is a Baltimore-based advertising agency which includes among its clients American Cyanamid Company, a manufacturer and seller of livestock health products, including antibiotics. RM & D prepares printed advertisements in farm media and veterinary journals for American Cyanamid. RM & D retained Dr. Herrick beginning in 1975 to provide it with general

---

1. Impro states that the basic theory behind its products is that milk from dairy cattle contains certain protective factors which have immunological properties. According to the plaintiff, the USDA suggested in a 1966 report that the plaintiff utilize the name "whey antibody blends" to describe its products because at the time the agency believed that antibodies contained in the milk were the active protective factors. Impro now states that subsequent research has led scientists to think that nonspecific protective factors in the milk, rather than antibodies, might create the products' possible immunological effect.

2. Two other corporate defendants, Diamond Laboratories,. Inc. and G.D. Searle & Co., entered into settlements with Impro prior to the district court's order granting summary judgment in favor of the remaining defendants.

information relating to the animal health economy, management trends, new products, new ideas and problem areas. In return, RM & D paid Dr. Herrick an annual fee of $10,000 for which American Cyanamid reimbursed RM & D.

### 3. *Upjohn Company*

Upjohn is a Delaware pharmaceutical corporation with its principal place of business in Chicago. It markets antibiotic drugs for animal health care. Upjohn began retaining Dr. Herrick in 1966 to provide its marketing staff with information concerning trends in the livestock health industry and competing products.[3] Upjohn paid Dr. Herrick $1,500 per year for his duties. Upjohn also has participated in trade organizations and sponsored university research relating to the animal health care industry.

### 4. *Philips Roxane, Inc.*

Philips Roxane is a Delaware corporation with its principal place of business in St. Joseph, Missouri. It sells a variety of animal health products, including antibiotics, biologics, teat dips, insecticides and instruments. Dr. Herrick began consulting for Philips Roxane in the mid-to-late 1960s. His duties included providing information on recent developments and problems in the animal health field, appearing at press conferences and meetings concerning the company's products, and providing answers to inquiries from Philips Roxane's technical marketing and sales staffs. In return, Philips Roxane provided Dr. Herrick with an automobile and reimbursed his automobile expenses. Philips Roxane also has participated in trade organizations and sponsored university research in the animal health field.

### E. COMPETITION BETWEEN IMPRO AND THE CORPORATE DEFENDANTS

According to Impro, its intrastate biological products are in competition with the antibiotic drugs produced by the corporate defendants (or in the case of RM & D, the antibiotics produced by its client American Cyanamid).[4] Impro contends that its products are effective in increasing milk production, and in preventing or controlling infections, and that its products do not produce the adverse side effects—primarily the creation of resistant bacteria and the existence of antibiotic residues in meat and dairy products—caused by antibiotic drugs.

Impro further asserts that the corporate defendants entered into a single conspiracy or several conspiracies with Dr. Herrick—under the guise of consulting agreements—to destroy Impro or to limit its effectiveness as a competitor. Its theory is that in return for compensation from the corporate defendants, Dr. Herrick used his various positions to promote the products of the corporate defendants, to disparage Impro's products, and to influence various federal and state governmental officials to deny Impro necessary licensing for its products.

The corporate defendants deny that any of them entered into a conspiracy with Dr. Herrick to suppress Impro as an effective competitor in the animal health field. They contend that there would be no reason for any of them to enter into such an agreement because Impro's biologics do not compete with their products and because there is no adequate scientific data indicating that Impro's products are efficacious. They additionally assert that Dr. Herrick's comments with respect to the products of Impro and the corporate defendants were legitimately and independently made in the

---

**3.** Upjohn's contracts with Herrick required him to keep their agreements confidential and to obtain the company's approval before consulting for other firms in the animal health field. Herrick breached this latter obligation.

**4.** Impro places primary importance on the competition between its biologics and the antibiotics sold by the various corporate defendants. We note, however, that Impro, as an intrastate biologics company, competes with the federally-licensed biologics which Philips Roxane sells on an interstate basis. Moreover, Impro competes with Babson in the sale of teat dips. Babson sells neither antibiotic drugs nor animal biologics.

course of his duties as an extension veterinarian and professor.

## F. THE PRESENT LITIGATION

In October, 1978, Impro filed an amended complaint alleging that the defendants had conspired to restrain trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and to monopolize trade in violation of Section 2 of the Act, 15 U.S.C. § 2, by disparaging Impro and its new and innovative animal health products.[5] Impro also included in its amended complaint several pendent state law claims.

On August 8, 1979, the district court denied the defendants' motion to dismiss and ordered the parties to proceed with discovery on Impro's amended complaint. That discovery continued for three years.

On August 17, 1982, the district court granted summary judgment in favor of the defendants on Impro's Sherman Act claims because it found no evidence of concerted action to restrain trade or to monopolize among the corporate defendants or between Dr. Herrick and any of the corporate defendants.[6] On October 19, 1982, the district court denied the plaintiff's motion for reconsideration. Impro appeals to this Court.

## II.

### THE SUMMARY JUDGMENT STANDARD

Summary judgment is justified only when, viewing the facts and inferences that may be derived therefrom in the light most favorable to the nonmoving party, the moving party establishes that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Buller v. Buechler,* 706 F.2d 844, 846 (8th Cir.1983). Here, the critical question is whether a jury reasonably could infer from certain evidence that Dr. Herrick and one or more of the corporate defendants entered into an agreement or agreements to harm Impro. In *Admiral Theatre Corp. v. Douglas Theatre Co.,* 585 F.2d 877, 884 (8th Cir.1978), we articulated the following standards for drawing such inferences:

> The plaintiffs were not required to directly prove the fact of an agreement * * *. Evidence from which an agreement could be inferred is sufficient. * * * However, to avoid [summary judgment] "the facts and circumstances relied upon must attain the dignity of substantial evidence and not be such as merely to create a suspicion." * * * Furthermore, an inference which a jury is entitled to draw must be based upon proven facts and not upon other inferences. (Citations omitted).[7]

## III.

### DISCUSSION

Impro has been plagued from the inception of this case by its inability to decide on its theory of antitrust liability. Impro's complaint and supporting documents appear to allege three possible conspiracies: (1) a single, overall horizontal conspiracy among all the defendants; (2) a single hub-and-spoke conspiracy in which each corporate defendant conspired separately with Dr. Herrick, but did not conspire among themselves; and (3) multiple vertical conspiracies between each corporate defendant and Dr. Herrick with no knowledge on the part of any corporation that others might be involved in similar schemes. On appeal, we need address only the latter two theories because Impro has not appealed from the district court's finding that there was no

---

**5.** As the district court recognized, Impro's section 2 claim is a "market structure" claim, rather than a "market share" claim, because it, like the section 1 claim, is premised on a conspiracy theory. Thus, the issue presented in both Impro's section 1 and section 2 claims is whether concerted action existed among any of the defendants.

**6.** Because the district court granted summary judgment against Impro's Sherman Act claims and because complete diversity of citizenship did not exist between the plaintiff and the defendants, the district court also dismissed Impro's state law causes of action for lack of jurisdiction.

**7.** *Admiral Theatre Corp. v. Douglas Theatre Co.,* 585 F.2d 877, 884 (8th Cir.1978), involved a motion for directed verdict, but *its* discussion of inferences is equally applicable to a motion for summary judgment.

evidence of a single, horizontal conspiracy among all the defendants.

## A. THE CONSPIRACY CLAIM

A threshold question is whether Impro has alleged a cause of action that is a cognizable conspiracy to restrain trade or conspiracy to monopolize under Sections 1 and 2, respectively, of the Sherman Act. The district court answered this question in the affirmative, and we agree. When an established producer of conventional products enters into a conspiracy to suppress a competitor's new and innovative product, that conspiracy will give rise to liability under sections 1 and 2—assuming all of the other elements of the causes of action under those sections are present.[8] *See American Society of Mechanical Engineers, Inc. v. Hydrolevel Corp.,* 456 U.S. 556, 102 S.Ct. 1935, 72 L.Ed.2d 330 (1982) (nonprofit engineers' society violated Section 1 of the Sherman Act when a chairman of one of its subcommittees improperly issued a letter casting doubt on the safety and efficacy of an innovative new product manufactured by Hydrolevel—a recent market entrant— and the subcommittee chairman acted at the behest of an established firm in competition with Hydrolevel); *International Travel Arrangers, Inc. v. Western Airlines, Inc.,* 623 F.2d 1255 (8th Cir.), *cert. denied,* 459 U.S. 1063, 101 S.Ct. 787, 66 L.Ed.2d 605 (1980) (airline violated Sections 1 and 2 of the Sherman Act by conducting a campaign—including false and deceptive advertising—to prevent travel group charters from becoming a competitive threat to its regularly scheduled air service); *McDonald v. Johnson & Johnson,* 537 F.Supp. 1282 (D.Minn.1982), *appeal docketed,* No. 82–1594 (8th Cir. May 17, 1982) (major health care company violated Sections 1 and 2 of the Sherman Act by purchasing producer of innovative pain-killing device to suppress it as a competitor of the defendant's drug products).

## B. THE CONCERTED ACTION REQUIREMENT

The next question is whether Impro has introduced sufficient evidence with respect to each of the elements of its conspiracy claims under Sections 1 and 2 of the Sherman Act to avoid summary judgment. Although both sections prohibit conspiracies, they apply to different conduct: section 1 proscribes conspiracies in restraint of trade; section 2 proscribes conspiracies to monopolize. 15 U.S.C. §§ 1 and 2. Consequently, the elements of proof for a cause of action under each section are not identical. See 2 Von Kalinowski, Antitrust Laws and Trade Regulation § 6.01 (1982) (hereafter "Von Kalinowski"); 3 Von Kalinowski, *supra,* at § 9.02. Both sections, however, require proof of concerted action. *Id.*

The concerted action requirement requires a finding that two or more persons entered into either an express or implied agreement. *Admiral Theatre Corp. v. Douglas Theatre Co., supra,* 585 F.2d at 884; *Modern Home Institute, Inc. v. Hartford Accident & Indemnity Co.,* 513 F.2d 102, 108–109 (2d Cir.1975). The conspiracy provisions of sections 1 and 2 do not prohibit independent business actions or decisions by individuals. *Id.* Moreover, to satisfy the concerted action requirement, the plaintiff must demonstrate that the defendants shared a "unity of purpose or a common design and understanding, or a meeting of the minds" to engage in the conduct prohibited by the Sherman Act. *American Tobacco Co. v. United States,* 328 U.S. 781, 810, 66 S.Ct. 1125, 1139, 90 L.Ed. 1575 (1946). *See Kiefer-Stewart Co. v. Joseph E. Seagram & Sons,* 340 U.S. 211, 213–214, 71 S.Ct. 259, 260–61, 95 L.Ed. 219 (1951); 2 Von Kalinowski, *supra,* at § 6.01; 3 Von Kalinowski, *supra,* at § 9.02.

We turn first to the concerted action issues presented by Impro's theory that a separate vertical conspiracy existed between Dr. Herrick and each corporate defendant.[9] The district court granted sum-

---

8. Whether a rule of reason or *per se* analysis is applicable to such a claim depends, of course, on the type of conduct in which the defendants engage in furtherance of their conspiracy or conspiracies.

9. With respect to Impro's theory of multiple vertical conspiracies, the defendants argue that Dr. Herrick cannot be found to have conspired, within the meaning of the Sherman Act, with each corporate defendant which retained him

mary judgment in favor of the defendants because it found no evidence showing that Dr. Herrick and any of the corporate defendants engaged in concerted action to harm Impro.

The plaintiff argues that it introduced evidence which reasonably supports an inference that Dr. Herrick and each of the corporate defendants entered into an agreement to suppress Impro as a viable competitor in the animal health industry, and that this evidence precludes summary judgment.

Impro relies primarily on three factors in support of this contention: First, the plaintiff's teat dips and biological products compete with the antibiotics, biologics and teat dips sold by the various corporate defendants (or in the case of RM & D, sold by its client American Cyanamid) in an overall animal health market. Impro urges that this competition provided the motive for the defendants to conspire against the plaintiff.

Second, each of the corporate defendants entered into an agreement with Dr. Herrick under which Herrick received a substantial consulting fee. Impro contends that these arrangements provide both circumstantial evidence of an opportunity to conspire and direct evidence of agreements between Dr. Herrick and each corporate defendant.

Third, the various defendants engaged in activities which were harmful to the plaintiff. Impro claims that these activities are consistent with the inference of concerted action to harm it which is raised by the

evidence of motive and opportunity to conspire.

Impro introduced evidence indicating that the following activities may have occurred:[10] First, Dr. Herrick used his position as a USDA veterinarian and an Iowa State University professor to actively promote the products of the corporate defendants and to disparage those sold by Impro when speaking to or writing for farmers, veterinarians, academicians, and others in the animal health field. For example, Dr. Herrick's articles in *Dairy Illustrated,* a Babson publication, contained favorable comments about products sold by Babson, Philips Roxane, and RM & D's client, American Cyanamid. In addition, Dr. Herrick appeared at a Philips Roxane press conference at which it introduced a new product— Somnugen—and subsequently worked to promote this product, including publishing a favorable article in a farm-oriented magazine and helping Philips Roxane refute charges that Somnugen contributed to bovine respiratory disease. Dr. Herrick also prepared an article in 1977 for a publication entitled "Animal Nutrition and Health," which stressed the alleged hazards of intrastate biologic products.

Second, Dr. Herrick made various efforts to prevent the company from obtaining federal and state licenses to market its products. For example, when the USDA announced in 1966 that it intended to issue Impro a federal license to market its biologics in interstate commerce, Dr. Herrick con-

as a consultant. We disagree. In *Poller v. Columbia Broadcasting System,* 368 U.S. 464, 469–470, 82 S.Ct. 486, 489, 7 L.Ed.2d 458 (1962), the Supreme Court held that a management consultant may be found to have conspired with his principal firm if the consultant has an independent economic interest in the alleged restraint of trade. Impro's pleadings and evidence demonstrate—at least for summary judgment purposes—that Dr. Herrick may have had an independent interest in engaging in activities to suppress Impro as an effective competitor in the animal health field. His position as a consulting veterinarian in the animal health field will be enhanced if his views concerning intrastate biologics are proven to be sound and correspondingly, that position will be weakened if his views are proven to be incorrect. *See American Society of Mechanical Engineers, Inc. v. Hydrolevel Corp.,*

456 U.S. 556, 102 S.Ct. 1935, 72 L.Ed.2d 330 (1982) (engineers' society—which, like Dr. Herrick here, accumulates and disseminates information as its primary function—violated Section 1 of the Sherman Act when one of its members issued a letter wrongfully disparaging the new product of Hydrolevel—a recent market entrant—and that member's conduct was undertaken upon the urging of an established firm in competition with Hydrolevel). *See also* Note, *"Conspiring Entities" under Section 1 of the Sherman Act,* 95 Harv.L.Rev. 661, 676–682 (1982).

**10.** Because we are reviewing a grant of summary judgment against the plaintiff, we relate the facts which follow in the light most favorable to Impro and give it the benefit of all reasonable inferences drawn from the record.

tacted a colleague at Iowa State University, Dr. Voelker, who in turn contacted Dr. Plowman from the USDA Agricultural Research Service, to persuade the USDA not to issue such an interstate license to Impro. The Agricultural Research Service thereafter initiated an investigation—the so-called Beltsville test—to determine the efficacy of Impro's biologic products. Before this test was commenced, Dr. Herrick contacted Dr. Plowman, who was conducting the test, and Dr. Hejl, the director of the USDA Extension Service in Washington, D.C., to object to Impro's products. Subsequently, the USDA revoked Impro's six-month interim license to market its products and to conduct research in a four state area. After the USDA finished the Beltsville test, it issued a report which generally concluded that Impro's products were not effective. Thereafter, the American Veterinary Medical Association, at the urging of its president Dr. Herrick, published the results of the Beltsville test in its scientific journal.

In 1976, Dr. Herrick worked on proposed state legislation in Iowa intended to restrict the use of intrastate biologics. Herrick also told an official from Grand Laboratories—a competing intrastate biologics producer—that the legislation was aimed at Impro, not Grand Laboratories. In addition, Dr. Herrick also provided information about Impro to officials from other states—including Minnesota, Michigan, Vermont and California—who were investigating the plaintiff's products.

Dr. Herrick wrote to USDA officials at various times in 1971, 1975, 1976, and 1977 to encourage the agency to scrutinize the efficacy of Impro's biological products and to be aware of possible unlicensed interstate sales. In 1976, USDA and FDA officials began investigating Impro for possible violations of the Virus, Serum and Toxin Act, 21 U.S.C. §§ 151 et seq. At various times throughout the investigation, which continued through 1978, officials at these two agencies contacted Dr. Herrick to discuss Impro and its products.

Third, certain of the corporate defendants also engaged in conduct harmful to Impro by participating in trade associations and sponsoring university research which were generally hostile to the plaintiff's products. For example, Philips Roxane and American Cyanamid are members of the American Health Institute—a trade association of federally licensed producers of animal health products—and specifically they are members of the Institute's Veterinary Biologics Licensees committee. The committee has engaged in litigation, congressional and executive lobbying and public information activities aimed at stopping the growth in sale of intrastate biologics.

Similarly, Philips Roxane, Babson and Upjohn are members of the National Mastitis Council, which is an organization comprised of governmental officials, industry representatives, veterinarians and university researchers. The council's public information programs have promoted the use of antibiotic drugs for preventing and treating mastitis, and they have reported that there is no evidence to support the use of whey antibodies or similar biologics for these health care purposes. Moreover, Babson was instrumental in founding the council and Upjohn has given research grants to four of the five nongovernmental scientists on the council's mastitis publication writing committee.

Babson, Philips Roxane, and Upjohn have contributed funds to university research. For example, Dr. Robert Bushnell, a USDA extension veterinarian at the University of California at Davis, received research grants from Upjohn and consulting fees from Babson. Thereafter, Dr. Bushnell contacted the California Department of Agriculture, urging it to take action against Impro. Similarly, in 1975 through 1978, Dr. Roger Mellenberger, a USDA extension dairyman at Michigan State University, sent letters and contacted public officials to urge the Michigan Department of Agriculture to revoke Impro's state commercial feed license. During this time, Upjohn was paying research grants to Dr. Mellenberger.

■ In summary, the plaintiff argues that evidence indicating that the various defendants had a motive and opportunity to conspire, combined with evidence that certain of the defendants engaged in conduct injurious to Impro, reasonably supports an

inference that Dr. Herrick and each corporate defendant engaged in concerted action to harm Impro. This inference, argues the plaintiff, is sufficient to create a question of fact as to whether there was the requisite concerted action in this case. We disagree.

As an initial matter, we emphasize again that to satisfy the concerted action requirement, the plaintiff must show more than the fact that Dr. Herrick entered into an agreement with each corporate defendant under which he received a substantial sum of money. The plaintiff must show that for each alleged separate vertical conspiracy, Dr. Herrick and a corporate defendant *knowingly* participated in an arrangement *with an intent to suppress* Impro as a competitor. *Admiral Theatre Corp. v. Douglas Theatre Co., supra,* 585 F.2d at 884. *See* 2 Von Kalinowski, *supra,* at § 6.01[3]; 3 Von Kalinowski, *supra,* at § 9.02[2] & [5].

Although the circumstantial evidence introduced by the plaintiff is relevant to the question of whether concerted action exists, *see Poller v. Columbia Broadcasting System,* 368 U.S. 464, 469–474, 82 S.Ct. 486, 489–92, 7 L.Ed.2d 458 (1962), it is not sufficient to raise a material question of fact with respect to whether there was the requisite concerted action between Dr. Herrick and any of the corporate defendants. *See, e.g., Weit v. Continental Illinois National Bank & Trust Co.,* 641 F.2d 457, 462–468 (7th Cir.1981), *cert. denied,* 455 U.S. 988, 102 S.Ct. 1610, 71 L.Ed.2d 847 (1982); *Modern Home Institute, Inc. v. Hartford Accident & Indemnity Co., supra,* 513 F.2d at 109–114. The district court found that the record rebuts any possible inference of concerted action raised by Impro's circumstantial evidence. It stated:

The alleged conspiracy agreement has been denied under oath by Herrick and all the officers and employees of the corporate defendants who have been deposed or given affidavits. All deny under oath that Impro and its products were even mentioned between or among any of them. No direct evidence to the contrary has been found. The sworn testimony of all concerned establishes without contradiction that none of the corporate defendants even knew that Herrick had consulting agreements with any of the other corporate defendants. And although a theoretic competitive motive to conspire existed for all defendants except RM & D, and opportunity to conspire existed for all defendants, the well established requisites for an inference of conspiracy from parallel conduct are not fulfilled by the record.

Defendants have shown by the uncontradicted sworn testimony of Herrick and the corporate defendants' officers and employees that the consulting agreements are not susceptible of plaintiff's conspiracy interpretation, and plaintiff has failed to meet its obligation of producing evidence supporting the conspiracy inference urged by it. As a result, plaintiff must suffer summary judgment dismissing its complaint.

We agree with this analysis.

The consulting agreements between Dr. Herrick and the various corporate defendants obviously had a legitimate business purpose. Standing alone they do not evince knowing participation by any of the corporate defendants in an arrangement with Dr. Herrick to harm Impro. Notwithstanding extended discovery,[11] however, Impro has not uncovered any evidence that any of the

11. The parties engaged in massive discovery. They deposed 103 persons (98 by the plaintiff), and many were questioned multiple times. The parties also exchanged thirty-two sets of interrogatories, thirteen sets of requests for admissions, and twenty-eight sets of requests for production of documents. This discovery period lasted for over three years and produced over 23,000 pages of transcripts and thousands of documents.

In addition, Impro directed requests to governmental agencies, including the USDA and FDA, under federal and state freedom of infor-

mation acts. Impro also conducted investigations and deposed personnel from certain trade organizations and universities—including the American Dairy Science Association, Animal Health Institute, National Mastitis Council, Iowa State University, University of Minnesota, Michigan State University, and University of California at Davis. Moreover, some of the discovery materials used by Impro—over the defendants' objections—were obtained in two other lawsuits related to this one. *Impro Products, Inc. v. Block,* No. 81–1284 (D.D.C. Sept. 2, 1982), *appeal docketed,* No. 82–24–47 (D.C.Cir.

agreements, in fact, represented a *quid pro quo* for Dr. Herrick's disparaging comments about Impro.

Nor was the plaintiff able to introduce any other evidence showing a connection between Dr. Herrick's activities and any of the corporate defendants. Uncontradicted testimony established that no employees of the corporate defendants (nor RM & D's client American Cyanamid) ever discussed Impro or its products with Dr. Herrick before this litigation was commenced.[12] Indeed, with a very few minor exceptions, no employees at any of the corporate defendants or American Cyanamid had ever even heard of Impro or its products prior to this lawsuit.

No one at RM & D had heard of Impro or its products prior to this litigation. At Upjohn, four veterinarians were familiar with Impro's name from their previous positions with the USDA, but they did not discuss the plaintiff with anyone at Upjohn. None of the Upjohn employees responsible for hiring or retaining Dr. Herrick had ever heard of Impro or its products. Two Philips Roxane vice presidents had seen Impro's products advertised before this lawsuit, but their uncontradicted testimony was that Impro was never discussed in any company meeting that they attended. Philips Roxane's president has been with the company since 1960 and has been actively involved in assessing competition, but he had never heard of Impro before this lawsuit was filed.

In addition, there is no evidence that any corporate defendant was aware of Dr. Herrick's actions about which Impro complains most bitterly: his alleged efforts to influence state and federal agencies to scrutinize the efficacy of Impro's products, to deny the plaintiff the required licenses to sell its products, and to investigate Impro for unlicensed sales.

Furthermore, there is no evidence in some 23,000 pages of testimony or in the thousands of documents introduced by the parties that any of the corporate defendants gave Dr. Herrick an explicit or implicit charge to promote their products or to attack those sold by their competitors. Nor is there record evidence that the corporate defendants were aware of Dr. Herrick's activities aimed at disparaging Impro. Rather, each corporate defendant retained Dr. Herrick to perform relatively specific duties—generally aimed at providing the company with information or new developments in the animal health field. We cannot assume, without evidence, that Dr. Herrick's consulting duties included harming Impro. The "[a]uthority to do illegal or tortious acts * * * is not readily inferred." *Harlem River Consumer's Cooperative, Inc. v. Associated Grocers of Harlem, Inc.*, 408 F.Supp. 1251, 1271 (S.D.N.Y.1976), *quoting,* Restatement (Second) of Agency § 34, comment d (1958).

Notwithstanding the foregoing, Impro urges that a jury reasonably could infer that the various corporate defendants and Dr. Herrick entered into agreements to harm Impro because of the alleged anticompetitive activities which occurred. Impro ignores the fact that the activities in question occurred over a very long period of time—nearly twenty years—and they were relatively few in number. In fact, most of the incidents about which Impro complains—particularly Dr. Herrick's alleged efforts to influence state and federal licensing officials—happened well before Babson and RM & D retained Herrick in 1976 and

---

Dec. 7, 1982), and *Impro Products, Inc. v. American Dairy Science Association,* No. 4–81–74 (D.Minn. filed Feb. 12, 1981).

**12.** The district court found that in 1977, Philips Roxane sent to the USDA's Biologic Licensing and Standards Division copies of advertising by Impro and Grand Laboratories, and inquired as to whether interstate advertising of intrastate biologics is lawful. Thereafter, the USDA ordered that this advertising be withdrawn from circulation. There is no evidence that Dr. Her-

rick knew of Philips Roxane's letter. Moreover, Philips Roxane's conduct in writing the letter to the USDA plainly was protected from antitrust liability by the *Noerr-Pennington* doctrine, which exempts from the antitrust laws any legitimate use of the political process by private persons to obtain legislative or executive action. *See Westborough Mall v. City of Cape Girardeau,* 693 F.2d 733, 746–747 (8th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 2122, 77 L.Ed.2d 1303 (1983).

1975 respectively. *See supra,* at 1270–1271.

Moreover, it is clear from the record that Dr. Herrick's duties as a USDA extension veterinarian obligated him to speak out, at least on occasion, with respect to various types and brands of animal health products. It may well be that Dr. Herrick acted unethically or unwisely in concealing the fact that he was receiving payments from the corporate defendants when he extolled their products and criticized those sold by Impro; but this conduct cannot serve as the basis for an antitrust action.

Impro also emphasizes that certain of the corporate defendants—Philips Roxane, Upjohn and Babson—as well as American Cyanamid and Dr. Herrick, were members of trade organizations which allegedly sought to prevent the sale of intrastate biologics such as those made by Impro. The district court, however, found that the organizations primarily involved, the Animal Health Institute and the National Mastitis Council, "serve the customary legitimate purpose of trade organizations, and that participation in the trade organizations by Herrick and [the] corporate defendants is wholly consistent with their professional and business interests." There is no contrary evidence in the record.

Similarly, Impro points to the evidence that Philips Roxane, Upjohn and Babson also sponsored university research which produced results critical of Impro's products and similar biologics. The district court found that "funding by corporations of university research in areas of their field of commerce is commonplace and wholly consistent with their business interests." There is no record evidence here showing that the contributions in question were made for any other purpose.

These findings demonstrate that there was no "unity of purpose or a common designated understanding, or a meeting of the minds" between Dr. Herrick and any of the corporate defendants aimed at suppressing Impro as a competitor in the animal health field. *See American Tobacco Co. v. United States, supra,* 328 U.S. at 810, 66 S.Ct. at 1139. The evidence simply failed to show that any of the corporate defendants knowingly entered into an arrangement with Dr. Herrick under which he would promote their products and disparage those sold by Impro. *See Admiral Theatre Corp. v. Douglas Theatre Co., supra,* 585 F.2d at 884. The only conclusion that can be drawn from the record here is that the activities engaged in by Dr. Herrick which may have harmed Impro were of his own volition and not the result of some unlawful agreement. Similarly, the alleged anticompetitive acts committed by the corporate defendants were the result of individual business decisions.

In the face of this uncontradicted evidence introduced by the defendants, the district court properly concluded that Impro's circumstantial evidence of motive and opportunity to conspire was not reasonably susceptible to the interpretation it sought to give that evidence. Consequently, Impro was obligated to show the existence of probative evidence supporting the inference of concerted action which it urged, or face summary judgment. *See First National Bank v. Cities Service Co.,* 391 U.S. 253, 288–290, 88 S.Ct. 1575, 1592–93, 20 L.Ed.2d 569 (1968); *Weit v. Continental Illinois National Bank & Trust Co., supra,* 641 F.2d at 462–468. But the plaintiff's only response to the defendants' evidence has been expressions of disbelief and challenges to the credibility of the defendants' witnesses.[13]

---

**13.** For example, when Impro's former president, Robert Collins, was asked to explain the facts on which he believed Philips Roxane was aware of Dr. Herrick's activities, despite the company's denials, Collins stated:

> They must have been aware of it or else they wouldn't have paid him. It's obvious to me. I don't have the facts that they were aware of who they were hiring and what they were doing, but they're an efficient company. They must know what their people are doing

or else they couldn't stay in business. Now that's just a fact, that they're an efficient company and have competent personnel, so when they hire someone and pay them a considerable amount of money, they must know what he's doing.

Similarly, Mr. Collins testified:

> Q. Mr. Collins, on what facts do you base your statement that you are sure that Philips Roxane considers IMPRO a threat?
> A. They have competent people.

Such efforts are not sufficient to defeat a motion for summary judgment. As the Second Circuit has noted, "[i]f the most that can be hoped for is the discrediting of the defendants' denials, no question of material fact is presented." *Modern Home Institute, Inc. v. Hartford Accident & Indemnity Co., supra,* 513 F.2d at 110.

To conclude, concerted action may be proven by inferences drawn from the defendants' conduct; but the circumstances shown must lead to "the conclusion with reasonable certainty and must be of such probative force as to create the basis for a legal inference and not mere suspicion." *Admiral Theatre Corp. v. Douglas Theatre Co.,* 437 F.Supp. 1268, 1286 (D.Neb.1977), aff'd, 585 F.2d 877 (8th Cir.1978), *quoting, Wesson v. United States,* 172 F.2d 931, 933 (8th Cir.1949). Although this record may raise questions with respect to Dr. Herrick's judgment, it does not contain any evidence which reasonably will support an inference that any of the corporate defendants entered into an agreement with Dr. Herrick intended to suppress Impro as a competitor. Accordingly, the district court properly granted summary judgment against Impro's section 1 and 2 claims based on a theory of multiple vertical conspiracies.

The plaintiff alternatively contends that the record evinces a hub-and-spoke or rimless wheel conspiracy in which each corporate defendant entered into a separate agreement with Dr. Herrick to harm Impro and each was aware that it was part of a larger scheme, but there was no overall agreement among all of the defendants.

In *Elder-Beerman Stores Corp. v. Federated Department Stores, Inc.,* 459 F.2d 138, 146–147 (6th Cir.1972), the Sixth Circuit articulated the following test for establishing a hub-and-spoke conspiracy in an antitrust context: [14]

> (1) that there is an *overall*-unlawful plan or "common design" in existence; (2) that knowledge that others must be involved is inferable to each member because of his knowledge of the unlawful nature of the subject of the conspiracy but knowledge on the part of each member of the exact scope of the operation or the number of people involved is not required, and (3) there must be a showing of each alleged member's participation. (Emphasis in original).

█ It is clear that the district court did not err in granting summary judgment in favor of the defendants on the plaintiff's hub-and-spoke conspiracy theory. [15] First, the third requirement of the *Elder-Beerman* test is the existence of a separate unlawful agreement between each spoke conspirator and the hub conspirator. As we detailed above, the record shows that no agreement to harm Impro existed between

**14.** There is some question whether the conspiracy provisions of Sections 1 and 2 of the Sherman Act apply to a hub-and-spoke conspiracy. We believe that they do. Two federal courts addressing this question have recognized—at least implicitly—that such a conspiracy is cognizable under the Sherman Act if the plaintiff introduces sufficient evidence to demonstrate that one exists. *See Elder-Beerman Stores Corp. v. Federated Department Stores, Inc.,* 459 F.2d 138, 146–147 (6th Cir.1972); *Harlem River Consumer Cooperative, Inc. v. Associated Grocers of Harlem, Inc.,* 408 F.Supp. 1251, 1279 (S.D.N.Y.1976). Moreover, in *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), when the Supreme Court first recognized that in certain circumstances criminal defendants can be jointly tried on a hub-and-spoke conspiracy theory, it indicated that such a theory might be used in a civil case even though it may not be appropriate in a criminal case.

Because Impro's evidence is insufficient to sustain a hub-and-spoke conspiracy theory, we need not determine whether it properly could be utilized in this case. *See United States v. Jackson,* 696 F.2d 578, 586–587 (8th Cir.1982), cert. denied, —— U.S. ——, 103 S.Ct. 1531, 75 L.Ed.2d 952 (1983) (various spoke conspirators cannot be tried together in a criminal case when they would suffer "from unwarranted imputation for others' guilt"). (Citation omitted).

**15.** Impro appears to contend that the district court did not rule on its hub-and-spoke conspiracy theory. We cannot agree. In its motion for reconsideration, Impro explicitly urged that the district court had failed to consider the hub-and-spoke conspiracy theory in its initial order and accompanying memorandum. Obviously, the district court was satisfied that the findings in its initial order and accompanying memorandum disposed of the plaintiff's hub-and-spoke claim.

any of the corporate defendants and Dr. Herrick.

Second, the record shows that none of the corporate defendants communicated with any of the others concerning Impro or its products until after the plaintiff commenced this lawsuit, and that none of the corporate defendants knew that Herrick had consulting agreements with any of the other corporate defendants. This evidence—combined with the district court's findings that none of the corporate defendants had entered into an agreement with Dr. Herrick to disparage Impro—precludes this Court from concluding, as required by the *Elder-Beerman* test, that there existed an overall plan to suppress the plaintiff as a competitor or that each defendant had knowledge that others were involved in the conspiracy. *See Elder-Beerman Corp. v. Federated Department Stores, Inc., supra,* 459 F.2d at 146–148; *Harlem River Consumer's Cooperative, Inc. v. Associated Grocers of Harlem, Inc., supra,* 408 F.Supp. at 1279–1282.

Because Impro failed to introduce evidence which at least raised a material question of fact as to whether it could satisfy the requirements of a hub-and-spoke conspiracy theory, the district court did not commit reversible error in granting summary judgment in favor of the defendants on this issue.[16]

### III.

### CONCLUSION

For the above-stated reasons, we affirm the district court's order granting summary judgment in favor of the defendants on

Impro's claims under Sections 1 and 2 of the Sherman Act.

---

**16.** Impro urges that the district court erred in applying the "conscious parallelism" doctrine because, contrary to the district court's view, the plaintiff did not rely on the theory that all the defendants engaged in a single; horizontal conspiracy. Impro's claim is plainly incorrect. In the proceedings below, Impro repeatedly referred to "a conspiracy among" all the defendants, "a common scheme or plan pursuant to which [the defendants] would jointly carry out activities," and other phrases to the same effect. Accordingly, the district court was fully justified in utilizing the "conscious parallelism" doctrine in an effort to place a recognized ana-

lytical framework on the plaintiff's contentions. *See Theatre Enterprises, Inc. v. Paramount Film Distributing Corp.,* 346 U.S. 537, 540–543, 74 S.Ct. 257, 259–61, 98 L.Ed. 273 (1954); *Admiral Theatre Corp. v. Douglas Theater Co., supra,* 585 F.2d at 884; *Venzie Corp. v. United States Mineral Products Co.,* 521 F.2d 1309, 1312–1316 (3d Cir.1975). We need not address the "conscious parallelism" issue on appeal because the plaintiff does not appeal from the district court's finding that the defendants were entitled to summary judgment on Impro's horizontal conspiracy theory.